Robert BENTLEY, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A02–0202–CR–160.

Court of Appeals of Indiana.

Nov. 27, 2002.

Susan D. Rayl, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Zachary J. Stock, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Robert Bentley brings this interlocutory appeal from the denial of his Motion to

Suppress. He raises the following issues on appeal:

1. Whether the officer seized Bentley for investigatory purposes.

2. Whether the officer had reasonable suspicion to justify the stop under the Fourth Amendment to the United States Constitution.

We affirm.

### FACTS AND PROCEDURAL HISTORY

On October 10, 2001, Indianapolis Police Officers Charles Martin and Steve Walters were patrolling in the 3000 block area of North Capitol Avenue in Marion County. Officer Martin, a twenty-year veteran of the police department, described the area as being known for narcotics possession and dealing. While he was patrolling, Officer Martin saw Bentley and another man kneeling down in front of a truck. Bentley was holding a pair of socks and a plastic bag with items inside. Officer Martin recognized Bentley because he believed he had arrested him in the past for a narcotics crime. He also later testified that, in the past, he had arrested narcotics dealers who used a plastic bag containing not only drugs, but other common items like clothing or groceries. The officer stopped his vehicle, blocking a lane of traffic, and turned on his emergency lights. Officers Martin and Walters both exited the vehicle and approached Bentley.

Officer Martin asked Bentley what he was doing, and Bentley responded that he was selling the other man a pair of socks. Officer Martin had not seen Bentley in this part of town in over a year, and he thought it was unusual to see someone kneeling down and giving away an item from a plastic bag. He then asked Bentley for his identification, and Bentley produced his Social Security card. Officer Martin asked Bentley if he had any identification with his photo and birth date, and Bentley gave the officer his probation identification card. The officer ran Bentley's information through his portable lap top computer in his vehicle and discovered that Bentley had two outstanding arrest warrants. Officer Martin placed Bentley under arrest, and during a search incident to arrest, discovered heroin in his wallet.

The State charged Bentley with Dealing in a Narcotic Drug, as a Class B felony, and Possession of a Narcotic Drug, as a Class D felony. Bentley filed a motion to suppress and argued that Officer Martin discovered the heroin as a result of an unlawful seizure. Following a hearing, the trial court denied his motion and stated in relevant part:

[W]hat we've got is ... an officer in an area that he patrols, that he's familiar with the defendant, that he sees the defendant crouched down passing something that as he approaches he determines to be socks .... I think that all leads to why he stopped this [sic] car, got out of his car, turned his lights on, and started to investigate. He comes up and sees that they're socks and he's got a bag. His training and experience tells him that there may be more going on here.

Now, if he'd have gotten them both up, put their arms on the car, searched him, gone through the bag, we wouldn't be here, okay. That's not what he did. He walked up, said, hey, what's going on? I'm selling these socks to this guy. Oh, well, you got any ID? Yeah, here it is. I think that those are nonintrusive. I think ... he had articulable reasons to investigate a situation and that while he's doing it, he has the ability to identify the parties and then check them for warrants. I think that there is no requirement ... that he has to advise a person that they are free to go.... I

think that ... asking a person for their ID is minimally intrusive; that he then finds that he has two warrants, arrests him, and here we sit. So, I'm going to show the motion to suppress is denied.

This appeal ensued.

## DISCUSSION AND DECISION

### Standard of Review

■ We review the denial of a motion to suppress in a manner similar to other sufficiency matters. *Overstreet v. State,* 724 N.E.2d 661, 663 (Ind.Ct.App.2000), *trans. denied.* We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Id.* However, unlike the typical sufficiency of the evidence case where only the evidence favorable to the judgment is considered, we must also consider the uncontested evidence favorable to the defendant. *Id.*

### Issue One: Was Bentley seized for Fourth Amendment purposes?

■ The first issue disputed by the parties is whether the officers "seized" Bentley when they stopped and questioned him. It is well established that "not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *see also Chappel v. State,* 591 N.E.2d 1011, 1014 (Ind.1992). As this court explained in *Overstreet,* 724 N.E.2d at 663:

[T]here are three levels of police investigation, two which implicate the Fourth Amendment and one which does not. First, the Fourth Amendment requires that an arrest or detention for more than a short period be justified by probable cause. Probable cause to arrest exists where the facts and circumstances within the knowledge of the officers are sufficient to warrant a belief by a person of reasonable caution that an offense has

been committed and that the person to be arrested has committed it. Second, it is well-settled Fourth Amendment jurisprudence that police may, without a warrant or probable cause, briefly detain an individual for investigatory purposes if, based on specific and articulable facts, the officer has a reasonable suspicion that criminal activity "may be afoot." Accordingly, limited investigatory stops and seizures on the street involving a brief question or two and a possible frisk for weapons can be justified by mere reasonable suspicion. Finally, the third level of investigation occurs when a law enforcement officer makes a casual and brief inquiry of a citizen which involves neither an arrest nor a stop. In this type of "consensual encounter" no Fourth Amendment interest is implicated.

(Citations omitted).

The question presented in this case is whether Officers Martin and Walters engaged in an investigatory stop, thereby implicating the protections of the Fourth Amendment, or whether their encounter with Bentley is better characterized as consensual. Bentley argues that the officers stopped to investigate him and that he was seized for Fourth Amendment purposes. The State responds that the Fourth Amendment was not implicated because Bentley was free to leave at any time. After a review of all the facts and circumstances, we agree with Bentley.

■ In *Terry,* 392 U.S. at 19 n. 16, 88 S.Ct. 1868, the United States Supreme Court stated that "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Moreover, "in order to determine whether a particular encounter constitutes a seizure, a court must

consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). Our supreme court applies this same standard. *See Heald v. State*, 492 N.E.2d 671, 675 (Ind.1986) ("The test to determine when a person has been seized is 'whether, considering all the circumstances surrounding the police-citizen encounter, the defendant entertained a reasonable belief that he was not free to leave.' ") (citation omitted).

As the Court noted in *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), "[t]he test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." The Court further stated that "what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Id.* But because the test utilizes an objective standard, that is, it looks to the reasonable person's interpretation of the conduct in question, it "allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment." *Id.* at 574, 108 S.Ct. 1975.

■ There are a number of factors we may consider to determine whether a person has been seized for Fourth Amendment purposes. In *Chesternut*, for example, the Court listed the following as possible actions an officer could take which a reasonable person would interpret as an intrusion upon freedom of movement: use of a siren or flashers, a command that the person halt, display of weapons, or operation of a police vehicle in an aggressive manner to either block the person's course or otherwise control the direction or speed of the person. *Id.* at 575, 108 S.Ct. 1975. Similarly, as this court stated in *Overstreet*, 724 N.E.2d at 664:

> Examples of circumstances under which a reasonable person would have believed he was not free to leave include the threatening presence of several officers, the display of a weapon by the officer, some physical touching of the person ..., or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

■ Bentley argues that the circumstances as a whole show that he was seized by Officers Martin and Walters. Specifically, he points to Officer Martin's testimony that when he observed Bentley kneeling in front of a truck with a pair of socks and a plastic bag in his hands, the officer activated the emergency lights on his police vehicle and stopped his vehicle in a way that blocked traffic. Thereafter, both officers exited the vehicle, approached Bentley, and started to ask him questions. When Bentley told them he was selling a pair of socks to the other man, they asked him to produce identification. When he gave them his Social Security card, they wanted identification with his photo and birth date. Additionally, Bentley points out that during the suppression hearing, the following colloquy between defense counsel and Officer Martin occurred:

Q: Did you tell [Bentley] that he was free to leave?

A: No.

Q: Was he, in fact, free to leave until you found out what those socks were?

A: Well, I basically wanted to know what he was doing and why they

were crouched down in front of this vehicle, and he said he was selling the guy a pair of socks. And as I stated earlier, there's times and occasions that I have dealt with people where they will have other items in a bag, such as a weapon and suspected narcotics, that they're dealing out of. *No, I guess at that point I was telling him he was not free to leave.*

Q: Okay. Is there a requirement that people produce ID when they ask you for it [sic]?

A: There's [sic] times they don't have it, no.

Q: Okay. And he wasn't free to leave until you'd determined his date of birth and who he was?

A: Well, had he wanted to walk away, then he would have had an opportunity. I would have just given Communication his name and social security number and have her find a date of birth and have run him for a warrant check.

(Emphasis added).

The State, on the other hand, asserts that the facts of this case are similar to those in *Overstreet.* In that case, early in the morning a police officer observed Overstreet look into a mailbox and then close the mailbox door. 724 N.E.2d at 662. Overstreet then walked hurriedly toward a parked vehicle and drove a short distance, where he stopped at a gas station. The officer, who did not recognize Overstreet as a regular newspaper carrier, watched as Overstreet exited his vehicle and began to pump air into one of his tires. *Id.* at 663. The officer then pulled his vehicle into the gas station and parked behind Overtreet's car. The officer did not activate the flashing lights on his vehicle. The officer walked over to Overstreet, asked him what he had been doing at the mailbox, and

asked for identification. Overstreet then volunteered that his license was suspended. *Id.* On appeal from Overstreet's motion to suppress evidence obtained as a result of an alleged unconstitutional stop, we held that no Fourth Amendment seizure occurred because the officer did not stop Overstreet's vehicle, nor did his actions restrict Overstreet's freedom of movement in any way. *Id.* at 664.

We agree with the State that, as in *Overstreet,* the officers in this case did not initiate a "stop" as that term is commonly understood where vehicles are involved. But unlike Overstreet, who had been driving a vehicle and stopped on his own accord, Bentley was merely a pedestrian standing in the street. Moreover, two officers in this case approached Bentley while he stood in the street. And significantly, unlike the officer in *Overstreet* who merely pulled the his vehicle into a gas station behind the defendant without activating his emergency lights, the officers in this case activated their emergency lights and parked their police vehicle in a manner that blocked a lane of traffic. *Cf. Chesternut,* 486 U.S. at 575, 108 S.Ct. 1975 (holding that no seizure occurred where no indicia, such as police activated sirens or lights, were present that would communicate to reasonable person an attempt to intrude upon defendant's freedom of movement); *see also Platt v. State,* 568 N.E.2d 1028, 1029 (Ind.Ct.App.1991) (stating Fourth Amendment seizure began when, during vehicle pursuit, officer activated his deck, grill and overhead lights), *vacated on other grounds,* 589 N.E.2d 222 (Ind.1992).

Finally, the State correctly points out that Officer Martin's testimony that Bentley was not free to leave is subjective and, thus, not relevant to our analysis. *See U.S. v. Mendenhall,* 446 U.S. 544, 554 n. 6, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (noting DEA agent's subjective intent to

detain defendant is irrelevant unless intent was conveyed). But our review of Officer Martin's testimony as a whole makes it clear that the officers stopped Bentley to investigate what they thought may be a possible narcotics transaction. Even though Officer Bentley also indicated during the hearing that Bentley "would have had an opportunity" to walk away had he wanted to, the circumstances of the stop, including the activated lights, position of the vehicle, and number of officers present, lead us to conclude that any reasonable person or passer-by on the street would conclude that Bentley was not free to leave the scene. Thus, Bentley was seized and subjected to an investigatory stop for Fourth Amendment purposes.

### Issue Two: Was the seizure justified under the Fourth Amendment?

■ Having determined that an investigatory stop occurred, we must now address Bentley's contention that the officers lacked reasonable suspicion to stop him.[1] The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ...." Searches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment. *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). However, one of the exceptions to the warrant requirement is where a police officer detains a person for investigative purposes.

*Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ In *Terry*, the Supreme Court held that law enforcement officers have a right to make a brief investigatory stop of a person provided they have a reasonable and articulable suspicion that the person has been, is, or is about to be engaged in criminal activity. *Id.* Whether a particular fact situation justifies an investigatory stop is determined on a case by case basis. *Platt v. State*, 589 N.E.2d 222, 226 (Ind. 1992). Reasonable suspicion entails something more than an inchoate and unparticularized suspicion or hunch, but considerably less than proof of wrongdoing by a preponderance of the evidence. *Luster v. State*, 578 N.E.2d 740, 743 (Ind.Ct.App. 1991). The reasonable suspicion requirement is satisfied where the facts known to the officer, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe that criminal activity has occurred or is about to occur. *Carter v. State*, 692 N.E.2d 464, 466 (Ind.Ct.App.1997).

■ Officer Martin, a twenty-year veteran of the police department, testified at the suppression hearing that the area in which he saw Bentley is known for narcotics possession and dealing. The officer observed Bentley and another man kneeling down in front of a truck. Bentley was holding a pair of socks and a plastic bag with items inside. Not only did Officer Martin recognize Bentley because he believed he had arrested him in the past for

---

1. As we have stated, Officer Martin discovered heroin in Bentley's wallet. Bentley does not challenge the officers' search of his person and wallet, which occurred *after* the officers discovered he had outstanding warrants and placed him under arrest. Rather, he argues that the officers lacked reasonable suspicion to justify the initial seizure, which renders the subsequent discovery of the heroin inadmissible as "fruit of the poisonous tree." *See Frye v. State*, 757 N.E.2d 684, 693 (Ind.Ct. App.2001) ("The 'fruit of the poisonous tree' doctrine bars the admissibility in a criminal proceeding of evidence obtained in the course of unlawful searches and seizures."), *cert. denied*, —— U.S. ——, 122 S.Ct. 2308, 152 L.Ed.2d 1063 (2002).

a narcotics crime, he also explained that he had arrested persons dealing narcotics in the past who used a plastic bag containing not only drugs, but other common items like clothing or groceries. He also thought that it was odd to see Bentley in the area because he had not seen him there in over a year.

The facts in this case are similar to the facts in *Shinault v. State*, 668 N.E.2d 274 (Ind.Ct.App.1996). In that case, we held that an officer was justified in making an investigatory stop of a defendant where the officer observed the defendant involved in some type of transaction, the transaction occurred in a well-known drug area, the officer knew that the person engaged in the transaction with the defendant had a history of criminal activity, and the two men ran when they saw the officer. *Id.* at 277. Here, as we have stated, Officer Martin observed Bentley engaged in some type of transaction while kneeling down in front of a truck; the transaction occurred in an area known for narcotics dealing and possession; and the officer thought he had arrested Bentley before on a narcotics crime. In addition, although Bentley did not flee like the defendant in *Shinault*, the officer explained that he had arrested persons in the past dealing narcotics out of a plastic bag that contained other items like clothing. As in *Shinault*, the officers in this case had reasonable suspicion to seize Bentley and investigate what he was doing.

Still, Bentley points out that prior to the seizure, Officer Martin did not see the exchange of money, narcotics, or a weapon. Rather, he was merely holding a plastic bag and a pair of socks. He also directs us to *Williams v. State*, 477 N.E.2d 96, 99 (Ind.1985), in support of his assertion that the fact that he was in a high crime area with a package does not rise to the level of reasonable suspicion. Additionally, he contends Officer Martin's knowledge of his criminal history should not constitute reasonable suspicion.

We agree with Bentley that had Officer Martin articulated only one of the several facts he discussed at the suppression hearing, our result may be different. For example, if Officer Martin had relied *exclusively* on the fact that Bentley was in a high crime area, or on the fact that he believed he had arrested him previously on a drug-related charge, the stop would not be justified. However, Officer Martin articulated a combination of facts which, when considered as a whole, led him to believe that criminal activity may be afoot. *See Terry*, 392 U.S. at 27, 88 S.Ct. 1868. Therefore, the officers had reasonable suspicion to stop Bentley.

## CONCLUSION

We conclude that Bentley was seized for Fourth Amendment purposes, but that the officers had reasonable suspicion to justify the stop. Thus, we conclude that the trial court properly denied Bentley's motion to suppress.

Affirmed.

SHARPNACK and FRIEDLANDER, JJ., concur.