Alfredo L. WESSLING, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 62A01–0301–CR–42.

Court of Appeals of Indiana.

Nov. 21, 2003.

Kimberly A. Jackson, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Christopher C.T. Stephen, Deputy Attorney General, Indianapolis, IN, Attorney for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, Alfredo L. Wessling (Wessling), appeals his conviction for involuntary manslaughter, a Class C felony, Ind.Code § 35–42–1–4.

We affirm, in part and reverse, in part.

## ISSUES

Wessling raises three issues on appeal, which we consolidate and restate as follows:

1. Whether the State presented sufficient evidence to sustain Wessling's conviction for involuntary manslaughter; and

2. Whether the trial court erred in sentencing Wessling to an aggravated sentence of six years, based on Wessling's mental capability, which was found to be both aggravating and mitigating.

## FACTS AND PROCEDURAL HISTORY

Wessling and Lance Bunner (Bunner) were in a relationship for approximately twelve years. They lived together at 401 15th Street in Tell City, Indiana. Around June 15, 2002, the couple, who were experiencing financial problems, moved from California to Tell City to live in Bunner's mother's house after her death. Both men were alcoholics, both had been ill, and, in addition, Wessling was diagnosed as HIV-positive.

On the mornings of August 23 and 24, 2002, paramedics were called to the residence because Wessling had drunk alcohol to excess and complained of abdominal pains. On August 23, 2002, both paramedics and the Tell City Police Department responded to Wessling's 911 call. Upon gaining entry into the residence, Tell City Police Officer John Allen (Officer Allen) noticed Wessling sitting in a chair in the living room. When walking through the house, Officer Allen saw Bunner asleep on the bed in the bedroom. He was partially covered with a sheet. After awakening him, Bunner sat up on the edge of the bed, wearing shorts. During his brief conversation with Bunner, Officer Allen noticed bruising on his thigh. Paramedics eventu-

ally took Wessling to the Perry County Memorial Hospital for treatment.

On August 24, 2002, around 7:15 a.m., paramedics and the Tell City Police Department responded to another call from Wessling. Upon arriving at the residence, Officer Allen found Wessling waiting outside for the paramedics. Officer Allen attempted to contact Bunner by knocking on the north door of the residence. Failing to get a response, Officer Allen proceeded to the south door which appeared to be unlocked. Opening the door, Officer Allen noticed Bunner lying on the living room floor. He appeared to be asleep and was covered with a sheet.

That same day, around 7:19 p.m., police and paramedics returned to the residence in response to another 911 call. After gaining entry into the residence, paramedics discovered Bunner laying on the living room floor, fully covered with a blanket. Upon pulling the blanket down, paramedics could not find a pulse or any respiration, instead, they noted a substantial amount of bruising on Bunner's nude body. Considering the death scene potentially abnormal, the paramedics notified the coroner's office. Because the cause of death was unknown, the deputy coroner contacted the police and ordered an autopsy.

Assistant Chief of Police Gregory Hendershot (Assistant Chief Hendershot) arrived at the residence to investigate Bunner's death. Although he also observed bruising and some scrapes on Bunner's nude body, none of these injuries appeared life threatening. Meanwhile, Tell City Police Officer Heather Glenn (Officer Glenn) spoke with Wessling. Wessling told Officer Glenn that Bunner had been sleeping on the floor for the past two days. During that time, he tried to give Bunner water and placed a damp towel on his head. Wessling further informed Officer Glenn that he decided to call 911 that evening

after hearing Bunner make a choking sound.

Upon removal of Bunner's body, Officer Glenn asked Wessling if he would like to go to the police department. Wessling agreed, however, he further informed Officer Glenn that he wanted to take off his necklace if he was going to jail. After reassuring Wessling that he was not going to jail, Officer Glenn transported him to the police department where she escorted Wessling to an interview room located in the basement. Upon the arrival of Assistant Chief Hendershot and Tell City Police Officer Alan Malone (Officer Malone), the three officers proceeded to question Wessling. This conversation was tape-recorded. Following Wessling's statement, Officer Glenn drove Wessling to the Harvest House, where lodging was arranged for him.

The next day, August 25, 2002, Assistant Chief Hendershot received the preliminary autopsy report from the deputy coroner indicating that the pathologist had ruled Bunner's death a homicide. That afternoon, Assistant Chief Hendershot arrested Wessling at the Harvest House. After the arrest, Assistant Chief Hendershot and Officer Malone transported Wessling to the Tell City Police Department. At the police department, Wessling and both officers sat outside on a picnic table and smoked a cigarette. During this time, Assistant Chief Hendershot advised Wessling of his rights and asked him to make a statement whereupon Wessling signed the waiver of rights form that Assistant Chief Hendershot read to him. The statement made at the picnic table was not tape-recorded. After finishing his cigarette, Wessling was moved to an interrogation room where the questioning continued, with a tape recorder running. At the end of the interview, police obtained Wessling's consent to search the residence.

On August 28, 2002, the State filed an information against Wessling, charging him with involuntary manslaughter, a Class C felony, I.C. § 35–42–1–4(c)(3). On November 8, 2002, Wessling filed a motion to suppress his statements given to the Tell City Police Officers on August 24 and 25, 2002, as violative of the Fourth, Fifth, and Sixth Amendments of the United States Constitution. On November 15, 2002, after an evidentiary hearing, the Perry Circuit Court denied the Motion to Suppress. On November 18, 2002, through November 22, 2002, a jury trial was held. At the conclusion of the trial, the jury convicted Wessling of involuntary manslaughter. On December 11, 2002, the trial court conducted a sentencing hearing. At the sentencing hearing, the trial court sentenced Wessling to the Indiana Department of Correction for six years.

Wessling now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Sufficiency of the Evidence*

Wessling contends that the evidence presented by the State was insufficient to support his conviction for involuntary manslaughter. Specifically, Wessling claims that the trial court erred in denying his motion to suppress since his post-arrest statement to the Tell City Police Officers (the "Officers") was inadmissible under the Fourth and Fifth Amendments to the United States Constitution. Furthermore, Wessling alleges that the State failed to present sufficient evidence to prove that Wessling delivered the fatal injuries to Bunner. Conversely, the State maintains that, since the Officers had probable cause to arrest Wessling, his post-arrest statements are admissible at trial. The State further contends that it presented suffi-

cient evidence to establish that Wessling killed Bunner.

## A. Standard of Review

Our standard of review for a sufficiency of the evidence claim is well-settled. In reviewing sufficiency of the evidence claims, we will not reweigh the evidence or assess the credibility of the witnesses. *Cox v. State*, 774 N.E.2d 1025, 1028–29 (Ind.Ct.App.2002). We will consider only the evidence most favorable to the verdict, together with all reasonable and logical inferences to be drawn therefrom. *Alspach v. State*, 755 N.E.2d 209, 210 (Ind. Ct.App.2001), *trans. denied.* The conviction will be affirmed if there is substantial evidence of probative value to support the conviction of the trier-of-fact. *Cox*, 774 N.E.2d at 1028–29. A verdict will be sustained based on circumstantial evidence alone if the circumstantial evidence supports a reasonable inference of guilt. *Maul v. State*, 731 N.E.2d 438, 439 (Ind. 2000).

## B. Motion to Suppress

■■■ At the outset, we note that a review of the denial of a motion to suppress is similar to other sufficiency matters. *Bentley v. State*, 779 N.E.2d 70, 73 (Ind.Ct.App.2002); *Overstreet v. State*, 724 N.E.2d 661, 663 (Ind.Ct.App.2000), *trans denied.* We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Overstreet*, 724 N.E.2d at 663. However, unlike a typical sufficiency of the evidence, we must also consider the uncontested evidence favorable to the defendant. *Id.*

First, Wessling alleges that the trial court erred by denying his motion to suppress his post-arrest statement of August 25, 2002, obtained in violation of the Fourth and Fifth Amendments of the United State Constitution. Specifically, Wessling contends that, since the Officers lacked probable cause to arrest him, his arrest was illegal. Consequently, Wessling maintains that his subsequent statement is inadmissible as fruit of the poisonous tree. Furthermore, Wessling claims that his statement was coerced by fear of intimidation. On the other hand, the State maintains that the trial court properly denied the motion to suppress Wessling's statements because the Officers had probable cause to arrest Wessling for the involuntary manslaughter of Bunner. Moreover, the State asserts that Wessling's statement was free and voluntary and not induced by violence, threats, promises or other improper influences.

### i. Probable Cause to Arrest

■■■ The Fourth Amendment of the United States Constitution, made applicable to the states by the Fourteenth Amendment, protects persons from unreasonable government intrusions into areas of an individual's life in which he has a reasonable expectation of privacy. *State v. Friedel*, 714 N.E.2d 1231, 1237 (Ind.Ct. App.1999). "The fundamental purpose of the Fourth Amendment is to protect the legitimate expectations of privacy that citizens possess in their persons, their homes and their belongings." *Friedel*, 714 N.E.2d at 1237 (citing *People v. James*, 163 Ill.2d 302, 206 Ill.Dec. 190, 645 N.E.2d 195, 197–98 (1994)) (citing *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238, 245 (1979)). However, it is well settled that a police officer may arrest a suspect without a warrant if that police officer has probable cause to believe that the suspect has committed a felony. *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1(1985).

■■■ Probable cause adequate to support a warrantless arrest exists when, at the time of the arrest, the officer has knowledge of facts and circumstances that could warrant a person of reasonable cau-

tion to believe that the suspect committed a criminal act. *Griffith v. State,* 788 N.E.2d 835, 840 (Ind.2003). The amount of evidence necessary to meet the probable cause requirement for a warrantless arrest is determined on a case-by-case basis. *Peterson v. State,* 674 N.E.2d 528, 536 (Ind. 1996), *cert. denied.* Probable cause can rest on collective information known to the law enforcement as a whole, and not solely on the personal knowledge of the arresting officer. *See Manson v. State,* 249 Ind. 53, 229 N.E.2d 801, 803 (1967), *cert. denied.* Where there is a police-channel communication to the arresting officer, he acts in good faith thereon, and such knowledge and information exists within the department, then the arrest is based on probable cause. *See Whiteley v. Warden,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971).

In the instant case, our review of the record clearly supports that the Officers had probable cause to arrest Wessling during the afternoon of August 25, 2002. The record establishes that on the morning of August 24, 2002, Officer Allen noticed Bunner laying on the living room floor. He appeared to be asleep and was covered with a sheet. The record reflects that when paramedics entered the residence later that evening, they found Bunner in the same position but without a pulse or respiration. Assistant Chief Hendershot testified that, upon arrival at the scene, he observed bruising and some scrapes on Bunner's nude body. He thought the pattern of bruises to be indicative of domestic violence. The record indicates that during Assistant Chief Hendershot's investigation of the residence, he found no evidence that there had been anyone else in the home. Moreover, Officer Glenn testified that Wessling stated that Bunner had been sleeping on the floor for the past two days; he called 911 that evening after he heard Bunner make a choking sound.

Furthermore, the preliminary autopsy report received by Assistant Chief Hendershot on the morning of August 25, 2002, shows that Bunner died of blunt force injuries to the head due to a physical assault. The report did not specifically describe the method used to cause this particular blunt force trauma. According to the pathologist's testimony, death was not instantaneous or even very quick but had occurred 12 to 24 hours prior to Bunner's body being found by the paramedics.

Based on these circumstances, we find that the police officers had sufficient evidence to meet the probable cause requirement for a warrantless arrest. *See Peterson,* 674 N.E.2d at 536. Therefore, they were reasonable in their belief that Wessling had committed the involuntary manslaughter on Bunner. *See Griffith,* 788 N.E.2d at 840. The arrest was thus valid.

*ii. Wessling's Post–Arrest Statements*

█ Wessling further contends that his post-arrest statements are inadmissible as fruit of the poisonous tree. Since we concluded that Wessling's arrest was supported by probable cause, and therefore valid, we find this contention without merit.

However, Wessling further alleges that, even though he was given his Miranda warning and signed a waiver, his post-arrest statement was elicited under duress and intimidation. Specifically, Wessling claims that he failed to understand the advisement of rights because of his mental limitations and illness. Moreover, he asserts that he felt intimidated and scared of the Officers.

 It is well established that the State bears the burden of proving beyond a reasonable doubt that the defendant knowingly and intelligently waived his rights, and that the defendant's confession was voluntarily given. *See Scalissi v.*

*State,* 759 N.E.2d 618, 621 (Ind.2001). A confession is voluntary if, in the light of the totality of the circumstances, the confession is the product of a rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will. *Id.* (citing *United States v. Dillon,* 150 F.3d 754, 757 (7th Cir.1998)). Thus, the critical inquiry is whether the defendant's statements were induced by violence, threats, promises, or other improper influence. *Page v. State,* 689 N.E.2d 707, 711 (Ind.1997). While making this determination, low mental capacity of a defendant alone is not a cause for excluding the evidence. *See Finchum v. State,* 463 N.E.2d 304, 309 (Ind.Ct.App. 1984). Rather, it is but one factor in the totality of the circumstances to consider in determining whether the confession was freely and knowingly given. *Id.*

Our reading of the evidence reveals no coercion, abuse, or intimidation by the Tell City Police Department. Rather, Wessling's asserted involuntariness focuses on his learning disabilities, his illness, and his purported confusion. The record reflects that Wessling was a special education student and a slow learner. Wessling testified at the suppression hearing that, at the time of his arrest at Harvest House and during his statement at the police department, he complained of kidney pains. Assistant Chief Hendershot stated that it appeared that Wessling experienced a "little bit of discomfort." (Transcript p. 67). However, at no point did Wessling request to see a doctor. The record further shows that the waiver of rights was read to Wessling and he answered in the affirmative when asked if he understood this waiver. Although the initial start of the interview was not taped, the taped portion lasted around 30 to 40 minutes. Wessling testified that during this statement "[w]hat I wanted to say I couldn't say, I had to say whatever they wanted me to say." (Tr. p. 88). Furthermore, Wessling stated that he was afraid of being beaten when he was taken to the police department because of his homosexuality. The record reveals that in the interview room Wessling felt pressured because he thought there was blood on the floor. Assistant Chief Hendershot testified that part of the floor in the interview room is painted red.

However, the record is devoid of any threats or intimidation made by the Officers while Wessling gave his statement. In fact, the record shows that Wessling himself testified that he was not threatened. Assistant Chief Hendershot further confirmed that none of the Officers ever coerced Wessling in making a statement.

In sum, we conclude that Wessling's statements were not induced by violence, threats, promises, or other improper influence. *See Page,* 689 N.E.2d at 711. The fact that Wessling had received special education and experienced some mental limitations, is not sufficient, in the totality of the circumstances, to result in an involuntary or unintelligent statement. *See Finchum,* 463 N.E.2d at 309. Thus, we find that Wessling understood the importance of the Miranda rights and knowingly waived these rights. Consequently, the State has proven beyond a reasonable doubt that the defendant knowingly and intelligently waived his rights, and that Wessling's statement was voluntarily given. *See Scalissi,* 759 N.E.2d at 621. Therefore, we conclude that the trial court properly admitted Wessling's statement into evidence.

C. *Presentation of the Evidence at Trial*

Next, Wessling alleges that the evidence presented at trial was insufficient to support his conviction for involuntary manslaughter. In particular, Wessling asserts that the State failed to prove beyond a

reasonable doubt (1) the cause of death as alleged in the charging information, and (2) that Bunner died from injuries caused by another person.

The charging information read, in pertinent part, as follows:

Gregory Hendershot, an officer with the Tell City Police Department, being duly sworn upon oath states that on or about August 24, 2002 at 401 N. 15th Street, Tell City, in Perry County, State of Indiana, Alfredo L. Wessling did kill another human being, to wit: Lance G. Bunner; while committing or attempting to commit Battery, to-wit: Alfredo L. Wessling knowingly and intentionally struck Lance G. Bunner near the right eye with his hand and kicked him.

(Appellant's App. p. 18)

Involuntary manslaughter is defined by I.C. § 35–42–1–4(c)(3), in pertinent part, as "[a] person who kills another human being while committing or attempting to commit: (3) battery; commits involuntary manslaughter, a Class C felony."

#### i. Variance in the Charging Information

■ Wessling initially argues that although the cause of death in the charging information is defined as striking "Bunner near the right eye with his hand . . .," the State failed to provide evidence establishing that any injury near Bunner's right eye caused his death. (Appellant's App. p. 18). Wessling asserts that, since the State specified the exact cause of death as a particular blow near the right eye, it was bound to prove this. We disagree.

■ A variance is an essential difference between proof and pleading. *Mitchem v. State,* 685 N.E.2d 671, 677 (Ind. 1997). Not all variances between allegations in the charge and the evidence at trial are fatal. *Id.* The test to determine whether a variance between the proof at trial and a charging information is fatal is as follows:

(1) was the defendant misled by the variance in the evidence from the allegations and specifications in the charge in the preparation and maintenance of his defense, and was he harmed or prejudiced thereby;

(2) will the defendant be protected in the future criminal proceeding covering the same event, facts, and evidence against double jeopardy?

*Id.*

The pathologist testified that Bunner died of blunt force injury to his head resulting in a subdural hematoma. He elaborated that no lethal injuries to Bunner's right eye were found. Rather, the pathologist clarified that the swelling of the right eyelid was due to a mild injury. Although it was difficult to pinpoint the exact injury causing death, he added that the blow to the left side of the head would have triggered the fatal hemorrhage. After the pathologist's testimony, the State realized that the specificity of the charging information did not conform with the testimony at trial. Thus, near the end of the trial, the State attempted to file an amendment to the information, charging that Wessling hit Bunner "on or near the right or left eye." (Tr. p. 726). The trial court rejected this amendment as tardy and prejudicial. During the discussion concerning the State's proposed amendment, Wessling's counsel stated that he relied on the State's failure to prove the cause of death being the blow near the right eye as his defense to the involuntary manslaughter charge.

However, the charging information fully informed Wessling of each of the material elements of the charge levied against him; thus the description of which blow on Bunner's head caused the fatal hemorrhage was not material or essential to the offense

charged. *See Mitchem v. State,* 685 N.E.2d at 677. Rather, Wessling knew throughout the proceedings that he was charged with committing a battery on Bunner thereby causing his death, regardless of which specific blow caused the fatality or where the blow landed. Therefore, we find that Wessling fails to prove that he was misled in his defense. *See id.* Consequently, we conclude that the variance in this case was not fatal.

### ii. *Injuries caused by another person*

■ Wessling next asserts that Bunner died because of the maladies he suffered, not because Wessling struck him. As we stated above, in order to convict Wessling, the State was required to prove that Wessling killed Bunner while committing or attempting to commit a battery.

Here, the record clearly shows that the State carried its burden of proof. Specifically, the record reflects that Officer Allen noticed bruising on Bunner's thigh on the morning of August 23, 2002. On the morning of August 24, 2002, Officer Allen found Bunner asleep on the living room floor, covered with a sheet. The paramedics found Bunner's dead body in the same position later that day. The record also indicates that Bunner died 12 to 24 hours before the paramedics discovered his body. Officer Glenn testified that Wessling told her that Bunner had been sleeping on the floor for the past two days; he called the paramedics after he heard Bunner make a choking sound. Furthermore, the State presented testimony from the pathologist that Bunner died as a result of blunt force injury to his head resulting in a subdural hematoma. The pathologist added that these head injuries were a consequence of a physical assault. Moreover, Assistant Chief Hendershot testified that Wessling admitted in striking Bunner in the area of the right eye with the heel of his hand.

With all of the above in mind, we find that the trier of fact could reasonably infer that Wessling killed Bunner while committing a battery. *See* I.C. § 35–42–1–4(c)(3). Therefore, we find that there is substantial evidence of probative value to support the conclusion of the trier of fact. *See Cox,* 774 N.E.2d at 1028–29.

### II. *Sentencing*

■ Lastly, Wessling contends that the trial court erred in sentencing him to an aggravated sentence of six years. Specifically, Wessling asserts that the trial court improperly used his mental capacity as both a mitigating and aggravating circumstance. Additionally, Wessling alleges that the trial court improperly balanced the aggravating and mitigating circumstances.

■ We note that sentencing decisions are within the trial court's discretion, which will be reversed only upon a showing of abuse of discretion. *Powell v. State,* 751 N.E.2d 311, 314 (Ind.Ct.App.2001). The trial court's sentencing discretion includes the determination of whether to increase presumptive penalties. *Madden v. State,* 697 N.E.2d 964, 967 (Ind.Ct.App. 1998), *trans denied.* In doing so, the trial court determines which aggravating and mitigating circumstances to consider, and is solely responsible for determining the weight to accord to each of these factors. *Perry v. State,* 751 N.E.2d 306, 309 (Ind. Ct.App.2001). The sentencing statement must: (1) identify significant aggravating and mitigating circumstances; (2) state the specific reason why each circumstance is aggravating and mitigating; and (3) demonstrate that the aggravating and mitigating circumstances have been weighed to determine that the aggravators outweigh the mitigators. *Powell,* 751 N.E.2d at 315. We examine both the written sentencing order and the trial court's comments at the sentencing hearing to determine whether

the trial court adequately explained the reasons for the sentence. *Id.* A sentence enhancement will be affirmed, if after due consideration of the trial court's decision, this court finds that the sentence was appropriate in light of the nature of the offense and the character of the offender. *See* App. R. 7(B); *Rodriguez v. State,* 785 N.E.2d 1169, 1174 (Ind.Ct.App.2003).

In the present case, Wessling received a six years sentence for his conviction. The presumptive sentence for a Class C felony is four years, with not more than four years added for aggravating circumstances or not more than two years subtracted for mitigating circumstances. *See* I.C. § 35–50–2–6. In support of its sentence, the trial court noted as an aggravating factor: "[i]n this case, I will find that the aggravating circumstance is [Wessling's] mental and physical infirmity as an aggravating circumstance." (Tr. p. 978). Additionally, the trial court stated the following as mitigating circumstances:

> As a mitigating circumstance, I will consider the statutory factor that [Wessling] has substantially lived a law abiding life. I can't consider a disorderly conviction 10, 12 years ago, was anything but a law abiding life. I'll consider also the non-statutory mitigating circumstance of [Wessling's] prior, or [Wessling's] limitations on his mental capacity, which I don't think are disabling, I don't think they are such that he is unable to control his behavior or is there any nexus between those limitations and what occurred here back in August.

(Tr. p. 978).

Wessling now argues that the trial court used his mental capacity as both a mitigating and an aggravating factor. As noted above, when reviewing a sentencing this court will examine both the written sentencing order and the trial court's comments at the sentencing hearing to determine whether the trial court adequately explained the reasons for the sentence. *Powell,* 751 N.E.2d at 315. During the sentencing hearing, the trial court commented that "I still can't ignore the fact that [Wessling] does have some mental limitations in terms of capacity." (Tr. p. 975). Furthermore, the trial court elaborated that:

> I think that [Wessling] does have some mental limitations, however, I *also* think that his alcohol use and abuse and the fact that he was under the consumption basically on a regular basis throughout this proceeding when it occurred back in August is the real reason all of this occurred. And, so, because of that, I think the nature and circumstances of the crime, the only thing that I can say there is that [Wessling's] mental and physical infirmity gives me concern and certainly allows me under sub-section (B)(6) of 35–38–17.1, to consider that as an aggravating circumstance.

(Tr. p. 976) (emphasis added). These considerations resulted in the trial court counting Wessling's mental capacity as both a mitigating and aggravating factor.

We disagree with the State's allegation that "[w]hile both of these determinations involve [Wessling's] person, one relates to the impact upon the nature and circumstances of this avoidable crime and the other focuses on the character of the offender." (Appellee's Brief p. 11). It is clear from the trial court's comments that Wessling's alcohol abuse was viewed as an aggravating factor impacting the nature and circumstances of the crime whereas the mental capacity was found to be a mitigator. However, the trial court failed to list the alcohol abuse as an aggravator in its ultimate findings.

Mindful of the above, we conclude that the trial court abused its discre-

tion when sentencing Wessling. *See id.* When considering the appropriateness of the sentence for the crime committed, courts should initially focus upon the presumptive sentence. *Hildebrandt v. State,* 770 N.E.2d 355, 361 (Ind.Ct.App.2002), *trans. denied.* Trial courts may then consider deviation from the presumptive sentence based upon a balancing of the factors, which must be considered pursuant to I.C. § 35–38–1–7.1(a) together with any discretionary aggravating and mitigating factors found to exist. *Id.* As noted above, the presumptive sentence for a Class C felony is four years. The trial court acknowledged as mitigating factors Wessling's mental capacity and his law abiding life. The trial court then used the same mental capability factor as an aggravator to deviate from the presumptive and impose a sentence of six years. *See* I.C. § 35–50–2–6. However, since this aggravator was improperly used, we are left with only two valid mitigators, *i.e.,* (1) a law abiding life, and (2) mental capability. Consequently, we find that the aggravated sentence imposed by the trial court was improper. Thus, we reduce Wessling's sentence to the presumptive sentence of four years.

### CONCLUSION

Based on the foregoing, we conclude that the State presented sufficient evidence to sustain Wessling's conviction for involuntary manslaughter. However, we find that the trial court abused its discretion by sentencing Wessling to an aggravated sentence of six years based on the same factor used as both an aggravator and mitigator. Therefore, we reduce Wessling's sentence to the presumptive term of four years.

Affirmed, in part and reversed, in part.

FRIEDLANDER, J., concurs.

SULLIVAN, J., concurs except as to Part I(C)(i) in which he concurs in result.