Laura J. McINTOSH, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 03A01–0405–CR–196.

Court of Appeals of Indiana.

May 23, 2005.

Publication Ordered June 13, 2005.

Rehearing Denied July 27, 2005.

Sean G. Thomasson, David M. Hooper, Thomasson & Thomasson, P.C., Columbus, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, George P. Sherman, Deputy Attorney General Indianapolis, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

Laura McIntosh appeals the trial court's denial of her motion to suppress her statements to police. We affirm in part and reverse in part.

### Issue

McIntosh raises one issue in this interlocutory appeal, which we restate as the following two:

I. Whether her first and second statements are inadmissible because they were obtained in violation of *Miranda;* and

II. Whether her third statement is inadmissible because the police used trickery and coercion to obtain it.

### Facts and Procedural History

McIntosh was eighteen years old when she was questioned by police about the armed robbery and murder of Nathan Carothers that occurred at Quail Run Apartments in Columbus, Indiana on August 9, 2001. In the early morning of August 10, 2001, police officers surrounded the Super 8 Motel where Laura was staying with her boyfriend, Timmy Allen, whom police also wanted to question about the incident at Quail Run. There were numerous police vehicles in the motel parking lot with their emergency lights on and several police dogs. The police called Laura and Timmy's motel room to let them know that the motel was surrounded. After Timmy walked out of the room with his hands in the air and was put in handcuffs, the police entered the room and detained Laura. She was patted down and searched, denied access to her purse, and escorted from the motel room with five police officers surrounding her.

She was handcuffed and placed into the rear seat of a police car. She was driven to the Columbus Police Department, where she was questioned by Columbus Police Detective Alan Hayes and Columbus Sheriff's Detective Greg Duke. The first interrogation lasted approximately one hour

and was not recorded.[1] Laura·was not advised of her *Miranda* rights before, during, or after this first unrecorded interrogation. She was told that she was not under arrest and was free to leave at any time. Laura claims that the detectives coerced her into talking about her involvement in the incident by telling her that they were not interested in prosecuting anyone for the robbery but only for the murder. She also claims that the detectives told her that they believed Timmy was the shooter and that if she made a credible statement about the incident, she could help him stay out of trouble.[2] She gave the police a statement about the events of August 9, 2001, admitting that she was at Quail Run during the robbery and murder.

The two detectives transported Laura back to the Super 8 motel, and she allowed them to search her car. After searching the car for approximately fifteen minutes, the detectives found no evidence and transported Laura back to the police station for further questioning. The police would not permit her to remove the car from the parking lot, but she was escorted to the motel room to retrieve her purse. Back at the station, the second interrogation lasted less than one hour and was videotaped with Laura's consent. Again, Laura was not Mirandized at any point before, during, or after this interrogation.

---

1. When asked why the first interrogation was not recorded, Detective Hayes stated that there was "not enough [recording] equipment to go around" that night. Tr. at 9.

2. Detective Hayes testified that neither he nor Detective Duke told Laura that they suspected Timmy fired the gun that killed Nathan Carothers. However, Detective Hayes did admit that prior to interrogating Laura, he was aware that witnesses had identified Timmy as the shooter and that the murder was his primary focus when questioning Laura. Tr. at

36. He also testified that Laura was "uncooperative" during the first twenty to twenty-five minutes of the interrogation but was unable to recall what detectives said to Laura immediately before she began cooperating and admitted her involvement in the incident at Quail Run. *Id.* at 33–34. Detective Hayes's memory of this first interrogation is rather sketchy; he admitted that two and a half years later, "it's hard to remember that far back." *Id.* at 42.

In the videotaped statement, Laura recounted the events of August 9, 2001. She explained that on that evening, Timmy called her and asked her to pick him up at the Taco Bell restaurant on 25th Street. They then went to BigFoot, where Timmy purchased gas and cigarettes. Laura saw Timmy talking to Mario Sanchez. Timmy got back in the car and told her that Mario "knows where some herb's at." St. Exh. 1 at 4. He told Laura to drive to Quail Run Apartments and to let Mario follow her because Mario did not know how to get there. On the way to Quail Run, Timmy told Laura that Mario had a gun. When they got to the apartment complex, Mario parked next to Laura's car, and then Timmy and Mario took off on foot and disappeared from Laura's sight.

Approximately five minutes later, Timmy got back in Laura's car and said, "Baby, let's go." *Id.* at 5. As they were driving away, Laura and Timmy heard a gunshot. They later met Mario at Steak 'n Shake, where Mario gave Timmy a portion of the stolen marijuana. Laura and Timmy rented a room at the Super 8 motel. In the early morning, Laura walked down to the front desk to get change for the vending machine and saw a newspaper with a front-page story about a murder at Quail Run. She ran back to the room and read the paper with Timmy. Later, the police called their room, and they were taken to the police station.

During the second interrogation, Laura stated her frustration that the state police were trying to "shake [her]" into thinking she may be "in so much trouble." *Id.* at 3. She discounted her role in the incident, stating, "we stole a little bit of fuckin' weed." *Id.* At the *end* of the interrogation, Detective Hayes stated, "You understand that you can get up and leave now or you could have got up and left three hours

ago, right?" *Id.* at 13. Laura answered affirmatively.

After giving the videotaped statement on August 10, 2001, Laura left the police station. Three days later, the police still had possession of her car. On the morning of August 13, 2001, an officer told Laura that she could speak to someone at the station about her car that afternoon. When she arrived at the station, Laura was led to an interrogation room and Mirandized by Detective Morton. She was then taken to a second interrogation room with a hidden video camera.

When Detective Hayes entered the room, Laura asked him why she had been advised of her *Miranda* rights. Detective Hayes explained that "every detective operates kind of in their own little world" and suggested to Laura that it had been a mistake for her to be Mirandized. State's Exh. 2 at 1. Detective Hayes then conducted a third interrogation, which began as follows:

> Det. Hayes: Ok and like I said, we . . . covered the *Miranda* issue earlier. A different detective come in here and read you your rights and . . .
>
> McIntosh: Right.
>
> Det. Hayes: . . . you said you understood that and we discussed what happened. So you're comfortable with that. Um let's just start at the beginning.

*Id.* Laura again related the events of August 9, 2001. This time, Detective Hayes questioned her more directly about her knowledge that a robbery was going to take place. Laura stated, "I mean I knew they planned on taking the weed." *Id.* at 8. She stated that she did not think that stealing marijuana was a "true crime" because it was illegal to have it in the first place, so "how can you get charged for stealing it?" *Id.* at 9. She also admitted that she knew prior to the robbery that

Mario had a gun in his possession but that she "didn't really think it was loaded." *Id.* at 8.

On August 15, 2001, Laura was arrested and charged with aiding armed robbery. On January 14, 2003, she was charged with felony murder. On December 16, 2003, she filed a motion to suppress her statements given during all three interrogations. The trial court held a suppression hearing on March 1, 2004. Among the witnesses was 'Dr. Richard Ofshe, a psychologist who testified that Laura's statements were coerced by police. He stated that Laura likely exaggerated her knowledge of and involvement in the robbery to appear credible to police in the interests of saving the person she believed to be in legal jeopardy, Timmy. On April 19, 2004, the trial court issued an order denying the motion to suppress. Laura then filed this interlocutory appeal.[3]

### Discussion and Decision

 Laura appeals the trial court's denial of her motion to suppress the statements she made during all three interrogation.

We review the denial of a motion to suppress evidence in a manner similar to allegations of insufficient evidence. We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. However, unlike the typical sufficiency of the evidence case where only the evidence favorable to the judgment is considered, in reviewing a denial of a motion to suppress, we must also consider the uncontested evidence most favorable to the defendant.

*Faust v. State,* 804 N.E.2d 1242, 1244 (Ind. Ct.App.2004) (citation omitted). The trial court has broad discretion in ruling on the admissibility of evidence, and we will reverse only if we find an abuse of discretion. *Goodner v. State,* 714 N.E.2d 638, 641 (Ind.1999). If there is sufficient evidence of probative value to support the denial of a motion to suppress, we will affirm the trial court's decision. *Taylor v. State,* 689 N.E.2d 699, 702 (Ind.1997). At a suppression hearing, the State bears the burden of demonstrating the constitutionality of measures it used to secure evidence. *State v. Glass,* 769 N.E.2d 639, 641 (Ind.Ct.App.2002), *trans. denied.*

Laura argues that her first and second statements are inadmissible because the police violated her *Miranda* rights. With regard to her third statement, she argues that it is inadmissible because the police obtained it through trickery and coercion. We address each contention in turn.

### I. Miranda Rights

 Laura claims that her statements to police during the first and second interrogation are inadmissible because she was in custody and the police failed to advise her of her *Miranda* rights. We agree.

[A] person who has been taken into custody or otherwise deprived of his freedom of action in any significant way must, before being subjected to interrogation by law enforcement officers, be advised of his rights to remain silent and to the presence of an attorney and be warned that any statement he makes may be used as evidence against him. Statements elicited in violation of this rule are generally inadmissible in a criminal trial.

*Loving v. State,* 647 N.E.2d 1123, 1125 (Ind.1995) (citing *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). Thus, a law enforcement officer is required to give *Miranda* warnings only

**3.** We heard oral argument in this case on January 27, 2005. We commend counsel for their well-prepared presentations, which assisted us in our deliberations.

when a person is in custody *and* is being interrogated. *Id.* at 1125–26. In this case, the parties agree that Laura was interrogated during each of the three interrogation. Thus, the crucial question is whether she was "in custody" for purposes of *Miranda*.

 To determine if someone is in custody, we apply an objective test considering if a reasonable person under the same circumstances "would believe themselves to be under arrest or not free to resist the entreaties of the police." *Kubsch v. State*, 784 N.E.2d 905, 917 (Ind. 2003). If a person is unrestrained and has no reason to believe she cannot leave, she is not in custody. *Id.*

### A. First Interrogation

 The State claims that Laura was not in custody during the first interrogation because after she arrived at the station, the police removed her handcuffs and told her that she was free to leave. However, Laura contends, and we agree, that the totality of the circumstances would indicate otherwise to a reasonable person. The police denied her access to her purse, keys, and car; she was taken into a secure area of the police station and was placed in an interrogation room where at least one officer was present at all times; and when she asked to use the restroom and later to take a smoking break, at least one officer escorted her from and back to the interrogation room. After approximately one hour of increasingly aggressive questioning, the police asked Laura for permission to search her car, which was still parked at the motel. Laura consented to the search, and the first interrogation ended.

Arguably, the Indiana case with the most similar facts is *Loving*, 647 N.E.2d 1123. In *Loving*, the defendant was handcuffed at the scene of the crime, placed in the back of a police car, and taken to the

police station by uniformed officers. He was led into an interrogation room where the police removed his handcuffs and questioned him. Our supreme court specifically noted the use of handcuffs in transporting the defendant to the police station:

Particularly in view of the initial use of handcuffs, we find that a reasonable person in the defendant's circumstances would not have believed himself to be free to leave but would instead have considered his freedom of movement to have been restrained to the degree associated with a formal arrest. Thus we find ... that the defendant was in custody at the time [the officer] questioned him.

*Id.* at 1125–26.

Like the defendant in *Loving*, Laura was handcuffed, put in a police car, and transported to the police station, where her handcuffs were removed and she was questioned. The State argues that *Loving* is distinguishable because no one communicated to the defendant that he was free to leave, whereas Detectives Hayes and Duke told Laura that she was free to leave and not under arrest prior to questioning her. However, our review of the uncontested evidence regarding the circumstances of the first interrogation and Laura's treatment during that time leads us to conclude that a reasonable person in her situation would not feel free to resist the entreaties of the police. *See Ackerman v. State*, 774 N.E.2d 970 (Ind.Ct.App.2002), *trans. denied* (holding that while no one factor was dispositive, a reasonable person transported from home with no obvious means of returning who had admitted possible illegal activity to police and then was advised of her *Miranda* rights would not feel free to leave).

The State directs us to two cases to support its argument that Laura was not in custody during the first interrogation.

First, our supreme court found that *Miranda* warnings were not required where a suspect was asked to go to the police station to give a statement. *Luna v. State,* 788 N.E.2d 832, 834 (Ind.2003). In that case, the police interrogated the defendant, unrecorded, for thirty-five minutes, after which the defendant agreed to give a taped confession. At the start of the taped statement, the police again informed the defendant that he was not under arrest and could leave at any time. At no time was the defendant advised of his *Miranda* rights. The court found that the defendant was not in custody for purposes of *Miranda* because a reasonable person in his circumstances would have felt free to leave the police station. *Id.* Similarly, our supreme court found no *Miranda* violation where two detectives stopped at a man's home and asked him to come to the police station with them to answer some questions about a murder. *Dye v. State,* 717 N.E.2d 5, 15 (Ind.1999), *reh'g denied.* He was handcuffed, but the officers told him that this was standard procedure and he was not a suspect. At the station, police informed him that he was free to leave, and he was interrogated for forty-five minutes without being Mirandized. His statement was deemed admissible because the court found that he was not in custody when he made it. *Id.*

The *Luna* and *Dye* cases are significantly different from Laura's situation, given the totality of the circumstances. Like the defendants in those cases, Laura was told that she was free to leave, but the fact that the police say, "you are free to leave at any time" is not the sole determinative factor of whether a person is in custody. While the "free to leave" comment in many circumstances may be the dispositive factor, it was not here, and it should not be perceived as some sort of legal talisman. When looking at the totality of Laura's circumstances, the police officers' actions spoke louder than their words. Their intimidating treatment of Laura would have conveyed to any reasonable person that she was not in fact free to leave. We conclude that Laura was in custody during the first interrogation and that the police violated *Miranda* by failing to advise her of her rights before interrogating her. Accordingly, we reverse the trial court's denial of Laura's motion to suppress with regard to her first statement.

### B. Second Interrogation

█ Following the first interrogation, the police took Laura back to the Super 8 Motel in a police car. With Laura's consent, they searched her car and found nothing of interest. According to the uncontested evidence in Laura's favor, she asked to retrieve her purse from her motel room and was escorted by an officer to the room and back to the parking lot. She then asked if she could take her car and go home, and the officers told her that "they were not 'done with [her] yet.'" Appellant's App. at 610. After being transported back to the station, Laura was taken to a different interrogation room in the same secure area where she had been during the first interrogation. She sat in the room alone for approximately thirty minutes and then exited the room with the intention of smoking outside. A policeman stopped her in the hallway and ordered another officer to escort her outside. When she was done smoking, another officer escorted her back to the interrogation room. Laura then made a recorded statement. She was not told that she was free to leave, nor was she read her *Miranda* rights prior to giving the statement in which she admitted, *inter alia,* having knowledge that Mario and Timmy planned to rob someone at the Quail Run Apartments and that Mario had a gun in his possession.

A reasonable person in Laura's circumstances would feel that she was not free to leave because, in fact, the police told her that she was not. Therefore, we conclude that the police violated *Miranda* by failing to advise her of her rights prior to the second interrogation, thus making Laura's second statement inadmissible.[4]

## II. Coercion by Police

### A. Third Interrogation

Laura claims that the police deceived her into unknowingly waiving her *Miranda* rights before the third interrogation. However, the evidence most favorable to the trial court's ruling indicates that Laura voluntarily went to the police station to speak to someone about her car, which had not yet been returned to her. While Laura was waiting to talk to Detective Hayes about her car, another detective entered the interrogation room, advised Laura of her *Miranda* rights, and left the room. When she later asked Detective Hayes why her rights had been read to her, his explanation suggested that the other detective had been confused and mistakenly Mirandized her. He told her that she could pick up her car the next day. Then, Laura asked Detective Hayes

several questions about Timmy, his situation in jail, and the status of the investigation. Detective Hayes asked Laura if she wanted to make a recorded statement, and she agreed.

 Laura contends that Detective Hayes "tricked" her into coming to the police station to discuss her car, caused her to involuntarily waive her *Miranda* rights, and induced her to make this third statement by promising the return of her car. There is sufficient evidence of probative value that the police did not deceive Laura and that no promises were made to her. As for the *Miranda* issue, Laura was not in custody during the third interrogation because a reasonable person in her circumstances would believe that she was free to leave at any time. Thus, there was no *Miranda* violation.[5]

 Laura also argues that the videotaped statement she gave during the third interrogation on August 13, 2001, is inadmissible because it was induced by coercion perpetrated by police during the course of all three interrogations. However, the facts most favorable to the trial

---

4. Because we find that a reasonable person in Laura's circumstances would feel she was in custody during the first and second interrogations, it is not necessary to separately address her contention that she should have been considered in custody for purposes of *Miranda* once she had admitted involvement in criminal activity. *See State v. Linck,* 708 N.E.2d 60 (Ind.Ct.App.1999) (holding that man was in custody for purposes of *Miranda* immediately upon admitting to police that he was smoking marijuana because a reasonable person in his circumstances would not feel free to leave). However, we note that Laura's admission to police of involvement in the Quail Run incident is another factor which militates toward a finding that Laura was "in custody" during the first and second interrogations.

5. Because we conclude that Laura was not in custody during the third interrogation, we

need not formally address the issue of whether she was properly advised of her *Miranda* rights. However, we do not condone the police officers' conduct in giving Laura conflicting explanations regarding the significance of her verbal waiver of those rights prior to the third interrogation. Further, though the officers' conduct surrounding the third interrogation does not rise to the level of illegality, there may be some basis for Laura's argument that she was possibly "set up" to make this third non-custodial statement after police realized they had violated *Miranda* during her first and second statements. It is our hope that the Columbus Police Department will err on the side of caution in the future and conduct interrogations that clearly follow the law of *Miranda*.

court's ruling do not support her argument.

It is well established that the State bears the burden of proving beyond a reasonable doubt that the defendant knowingly and intelligently waived his rights, and that the defendant's confession was voluntarily given. A confession is voluntary if, in the light of the totality of the circumstances, the confession is the product of a rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will. Thus, the critical inquiry is whether the defendant's statements were induced by violence, threats, promises, or other improper influence.

*Wessling v. State,* 798 N.E.2d 929, 935–36 (Ind.Ct.App.2003) (citations omitted).

▰ Dr. Richard Ofshe, a University of Berkeley psychologist who was qualified as an expert in social psychology and police interrogation techniques, testified at the suppression hearing. He stated that the police psychologically coerced Laura in all three interrogations. The trial court reviewed Dr. Ofshe's report and hear his testimony before denying Laura's motion to suppress.

The finder of fact is entitled to weigh and determine the credibility to be accorded the expert's opinion based on the evidence presented, including the extent of the witness's experience and expertise, the reliability of the analytical methods employed, and the degree of certitude with which the opinion is cast. *Schaefer v. State,* 750 N.E.2d 787, 794 (Ind.Ct.App.2001). We will not accept Laura's invitation to reweigh the expert evidence in her favor. We disagree with Laura's claim that Dr. Ofshe's opinion was uncontested. The trial court heard and evaluated plenty of evidence during the suppression hearing that may have affected the opinion's weight. For example, the court heard the police officers' testimony, which contradicted many of the facts upon which Dr. Ofshe's opinion was based; viewed Laura's videotaped statements, which contained evidence of her demeanor while she talked with police; and observed Dr. Ofshe's testimony, leading it to form an opinion regarding his credibility.

We find that there is sufficient evidence to support the denial of Laura's motion to suppress the statement she made during the third interrogation. The State met its burden of proving the constitutionality of the measures it used to secure Laura's third statement. She walked into the police station voluntarily and agreed to make a recorded statement. Because she was not in custody, the police were not required to obtain a voluntary waiver of her *Miranda* rights. We therefore affirm the trial court's denial of Laura's motion to suppress her third statement.[6]

Affirmed in part, reversed in part.

RILEY, J., and VAIDIK, J., concur.

---

**6.** We note that during oral argument, we raised the issue of whether the "fruit of the poisonous tree" doctrine applies to Laura's third statement in this case, i.e. was her third statement tainted because it arguably flowed from the first two statements which were obtained in violation of *Miranda? Wong Sun v. U.S.,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Our own research performed following the argument indicates that the fact that Laura had "let the cat out of the bag" in her prior statements is only one factor to be considered in the totality of the circumstances when determining the voluntariness, and thus the admissibility, of her third statement. *Johnson v. State,* 269 Ind. 370, 380 N.E.2d 1236, 1241 (1978). *See also Meadows v. State,* 785 N.E.2d 1112, 1119 (Ind.Ct.App. 2003), *trans. denied* (holding that police officers, while questioning a person for the second time, may reference the initial statement which was obtained in violation of *Miranda,*

*ORDER*

This Court having heretofore handed down its opinion in this appeal on May 23, 2005 marked Memorandum Decision, Not for Publication.

Comes now the Appellant, by counsel, and files herein her Motion to Publish, alleging therein that this Court's opinion clarified a rule of Miranda law and distinguished this case from other similar cases. The Appellant alleges that this decision will help prosecutors and law enforcement throughout the state as it cautions them not to use the words "you are free to leave at any time" but then subsequently acting in a completely different way which would lead reasonable person to believe that they are in custody.

The Court having examined said Motion, having reviewed its opinion in this appeal and being duly advised, now finds that said Motion to Publish should be granted.

IT IS THEREFORE ORDERED that the Appellant's Motion to Publish is GRANTED, and this Court's opinion heretofore handed down in this cause on May 23, 2005, marked Memorandum Decision, Not for Publication, is now ordered published.

CRONE, VAIDIK, J.J., concur.

RILEY, J., dissents.

but may not use the earlier statement to threaten or coerce the defendant into giving

the subsequent statement).