STATE of Indiana, Appellant–Plaintiff,

v.

Michael KELLER, Appellee–Defendant.

No. 49A04–0505–CR–297.

Court of Appeals of Indiana.

April 10, 2006.

Steve Carter, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, for Appellant.

Julie Ann Slaughter, Marion County Public Defender Agency, Indianapolis, for Appellee.

## OPINION

ROBB, Judge.

Michael Keller is charged with murder, felony murder, two counts of arson as Class A felonies, theft as a Class D felony, possession of methamphetamine as a Class C felony, and robbery as a Class A felony. Before trial, Keller moved to suppress the search of his hotel room, including his coat, and to suppress the two statements he made to law enforcement officers during separate interviews. After a hearing on the two motions, the trial court denied Keller's requests as to the search and his second statement, but suppressed his first statement. Upon the State's request, the trial court certified the interlocutory order for review, and this Court accepted jurisdiction.[1] We affirm.

---

1. We thank Indiana State University for hosting the oral argument on March 7, 2005, at the Hulman Memorial Student Union Building. We also thank counsel on both sides for their arguments, made in the presence of Indiana State University students, staff, faculty, and guests.

*Issues*

The State raises one issue for review, which we restate as whether the trial court properly granted Keller's motion to suppress his first statement to law enforcement officers. By way of cross-appeal, Keller calls into question the trial court's denial of suppression regarding his second statement and the search of his hotel room.

*Facts and Procedural History*

On December 1, 2003, Keller was arrested as part of an investigation into the death of Douglas Cook, who was shot in the head and left to die in a burning automobile. During the investigation, it was revealed that Cook had stayed in a hotel room the night before that was rented for him by Cindy Sugars using her name and money Cook had given her. Law enforcement officers, looking for Sugars, went to the hotel room accompanied by a hotel maintenance employee. Knocking at the door, the employee indicated that it was maintenance. A woman answered the door and permitted the officers to enter. The officers did not know at the time that the woman answering the door was not Sugars. There were three individuals occupying the room in various states of undress, including Keller. For officer safety, the occupants' clothing was searched for weapons before the individuals were allowed to dress, and were moved into the hallway.

Each occupant's coat was also searched. Inside a pocket of Keller's coat, Sergeant Michael Gullion discovered a bullet, which he confiscated, as well as money and drugs. Sergeant Gullion did not remove the money or drugs, and placed the coat back on the bed where he found it. The occupants were escorted into the hallway, where everyone waited until Sugars arrived and signed a consent form for a search of the room. No law enforcement officers re-entered until consent was given, at which time the crime lab processed the room, including the drugs found in Keller's coat and paraphernalia in plain view on a table.

Keller was arrested and taken to Sheriff's Department headquarters, where Sergeant Gullion and Detective Scott Scheid performed a videotaped interview approximately three hours in duration.[2] As it began, Keller was informed that he was under arrest for the drugs. Detective Scheid asked Keller's age, to which Keller responded twenty-one. Detective Scheid then began the process of advising Keller of his rights, indicating that he would do so "real quick" to "get this out of the way." State's Exhibit 2 at pg. 1. He asked whether Keller could read and write, and Keller responded affirmatively. Detective Scheid, sitting across from Keller, slid a piece of paper in front of Keller and described it as an advice of rights form. He explained to Keller: "I need you to read that, okay and then initial each one of those if you understand, okay."[3] *Id.* The language of the form was as follows:

> [Keller:] Yeah.
> [Gullion:] You understood that? Huh?
> [Scheid:] Could you initial each one of these for me.
> [Gullion:] There you're suppose [sic] to sign that.
> [Scheid:] You, you need to sign right here, I'm sorry. You signed in the wrong place.
> *Id.* at 2.

---

2. The record includes the videotaped interview and a transcription.

3. The full colloquy regarding the advice of rights was as follows:
 [Scheid:] Okay, um this section right here is your advice of rights, I need you to read that, okay and then initial each one of those if you understand, okay.
 [Gullion:] Did you read that?

Before we ask you any questions, you must understand your rights.

1. You have the right to remain silent.

2. Anything you say can be used as evidence against you in court.

3. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

4. If you cannot afford a lawyer and you want one, one will be appointed for you by the court before any questioning.

5. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

State's Ex. 1.

The videotape shows Keller, who was smoking a cigarette, glance quickly over the form before turning away to flick ashes into an ashtray. Returning his attention to the form, Keller looks it over again briefly before signing it. Sergeant Gullion, sitting to Keller's left, asks if Keller has read the form, to which Keller nods affirmatively, saying "Yeah." *Id.* Sergeant Gullion also asks if Keller understands the form, but it is unclear whether Keller responds. Detective Scheid then reminds Keller to initial each statement of advice on the form. Keller briefly reviews the statements and writes his initials beside each. When Detective Scheid notices that Keller has signed in the wrong place, he directs Keller to resign in the proper location. Following completion of the advice of rights form, Keller is questioned concerning Cook's death. He eventually makes incriminating statements, implicating both himself and another individual.

The following day, after a different law enforcement officer read Keller his rights from the advice of rights form, Keller again signed and made a statement. Keller was charged on seven counts, including murder, felony murder, two counts of arson, theft, possession of methamphetamine, and robbery. Before trial he made two motions to suppress evidence, one for the search and a second for his statements. The trial court conducted a hearing, during which Sergeant Gullion and Detective Scheid testified and a portion of the videotaped first statement was played for the trial court's review, resulting in the trial court's suppressing Keller's first statement. The State sought certification of the order for interlocutory appeal. The trial court obliged, and specified the legal question at issue as:

[W]hether or not giving a defendant an advice of rights form that contains all the rights required [by] *Miranda* and asking the defendant to read it and sign it, if he understands it, but without orally reading each right to him contained on the form and without insuring that defendant has in fact read the form and understands the rights and the waiver of those rights, is a sufficient advisement of the *Miranda* rights; and is a defendant's signature and subsequent interview a knowing and voluntary waiver of those rights.

Appendix of Appellant at 40. This Court granted the State's Petition for Interlocutory Appeal on July 6, 2005, and accepted jurisdiction. The State now challenges the trial court's suppression of statements made in Keller's first interview. Keller cross-appeals on the trial court's denial of his motion to suppress his second statement and the search of his hotel room, including his coat.

*Discussion and Decision*

I. Jurisdiction and Standard of Review

Preliminarily, we note that Indiana Appellate Rule 5 designates this Court with

jurisdiction over interlocutory appeals under Rule 14. Appeals may be taken from interlocutory orders in some circumstances by right, and in others when the trial court certifies its order for review. Ind.App. Rule 14(A), (B). Here, the trial court certified its order of April 18, 2005, over which we accepted jurisdiction. However, the trial court never issued a written order for either of the motions to suppress, instead ruling orally and referring to the suppression hearing transcripts as its findings and conclusions. As a result, without a written order pertaining to each individual motion, or both of the motions, we treat the hearing in its entirety as one order that resolves the issues presented in both of the motions by granting suppression of Keller's first statement only.

■ In its certification order, under Indiana Appellate Rule 14(B)(1)(c)(ii), the trial court indicated the grounds for certification as being the existence of a substantial question of law, the early determination of which will promote a more orderly disposition of the case. It further specified the legal question as limited in scope to whether Keller was sufficiently advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), prior to his first statement to law enforcement. However, Keller also contends that the trial court erred when it denied suppression of his second statement and the search of his hotel room. The State replies that because the trial court only certified a specific question on appeal, this Court does not have jurisdiction to consider the other issues raised by Keller as he did not pursue separate certification on those issues. We disagree.

The language of Rule 14(B) clearly identifies certification of an order, not of specific issues or questions. *Budden v. Board of School Com'rs of City of Indianapolis,*

698 N.E.2d 1157, 1166 n. 14 (Ind.1998) ("Thus, as a technical matter, certification of the order, not the question, is proper."). Even so, our supreme court has affirmed that "although the trial court certifies an order, there is nothing to prohibit the trial court from identifying the specific questions of law presented by the order for the appellate court's review." *Id.* Although this may often be helpful, appellate courts are under "no obligation to accept the issue as framed by the trial court or to answer it." *Id.*

Here, Keller's attempt to cross-appeal on issues not specified by the trial court's certification order highlights the desirability of written orders from the trial court. Had the trial court issued separate orders, one for each of Keller's motions to suppress, the question of whether it properly denied suppression of the search of Keller's hotel room would not be before us without certification. Instead, the trial court's determinations regarding both of Keller's motions to suppress were certified by the trial court as one order, and a request by Keller to certify any specific issues therein would have been redundant. Moreover, we are not limited in our review to the legal question as framed by the trial court.

■ Where a party appeals from the trial court's grant or denial of a motion to suppress, it appeals from a negative judgment and must show that the ruling on the motion was contrary to law. *State v. Mason,* 829 N.E.2d 1010, 1015 (Ind.Ct.App. 2005). We reverse only where the evidence is without conflict and all reasonable inferences lead to a conclusion opposite that reached by the trial court. *Id.* We treat the review of a motion to suppress in a fashion similar to instances in which the sufficiency of the evidence is challenged. *Bell v. State,* 818 N.E.2d 481, 484 (Ind.Ct. App.2004), *trans. denied.* To this end, we

will not reweigh the evidence or judge witness credibility, and consider the evidence most favorable to the trial court's ruling. *Id.* In doing so, "we must review the totality of the circumstances[,] thereby requiring this court to review all the facts and circumstances that are particular to this case." *Id.* We will disturb the trial court's ruling on a motion to suppress only upon a showing of abuse of discretion. *Wright v. State,* 766 N.E.2d 1223, 1229 (Ind.Ct.App.2002).

### II. Keller's First Statement to Law Enforcement

■■■ The State acknowledges its burden under *Miranda* to prove that Keller voluntarily made a knowing and intelligent waiver of his rights. *See Wessling v. State,* 798 N.E.2d 929, 935 (Ind.Ct.App. 2003). *Miranda* warnings are based upon the Fifth Amendment Self–Incrimination Clause, and were designed to protect an individual from being compelled to testify against himself. *Curry v. State,* 643 N.E.2d 963, 976 (Ind.Ct.App.1994), *trans. denied.* As such, "only verbal statements preceding an advisement of *Miranda* rights that are both testimonial in nature and elicited during custodial interrogation must be suppressed." *Id.* "A waiver of one's *Miranda* rights occurs when the defendant, after being advised of those rights and acknowledging that he understands them, proceeds to make a statement without taking advantage of those rights." *Ringo v. State,* 736 N.E.2d 1209, 1211–12 (Ind.2000). There is no formal requirement for how the State must meet its burden of advising an individual consistent with *Miranda,* so this court examines the issue in light of the totality of the circumstances. *Wessling,* 798 N.E.2d at 936.

### A. Knowledge and Understanding of Constitutional Rights

■■■ In the appeal at hand, the threshold questions are whether Keller was adequately advised of his constitutional rights by Sergeant Gullion and Detective Shied, and whether they insured that Keller understood those rights prior to waiving them. During the suppression hearing, a short portion of the videotape showing Keller signing the form was played for the trial court, and the transcript was made available for reference. The trial court interpreted the evidence as portraying "that the defendant immediately and instantaneously begins to initial, and does not take any time, whatsoever, to read through the document." Transcript at 70. The trial court found: "There is no colloquy, whatsoever, to ensure ... that [Keller] understood his rights, first of all, and no evidence, whatsoever, to show that the defendant voluntarily waived them." *Id.* It acknowledged Keller's recognition during his statement that he could be incriminating himself, but also found a complete lack of conversation about other rights waived by Keller—the right to counsel, appointed if necessary, and the right to stop talking at any time. *Id.* at 70–71. Keller's first statement to law enforcement was therefore suppressed.

The trial court also briefly discussed *U.S. v. Patane,* 542 U.S. 630, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004), which it found analogous. In that case, Samuel Patane was arrested for violation of a restraining order. One of the arresting officers attempted to advise Patane of his *Miranda* rights, but got no further than the right to remain silent, at which point Patane interrupted and asserted that he knew his rights. Neither officer attempted to complete the advisement of rights. *Id.* at 635, 124 S.Ct. 2620. At trial, the Government conceded that Patane's responses to further questioning were inadmissible under *Miranda.* *Id.* at 635 n. 1, 124 S.Ct. 2620. The issue presented for

review was whether a handgun, fruit from the unwarned statement, was admissible. In the present case, the trial court compared the facts of Keller's circumstances to those in *Patane* because of evidence that Keller "did a *Miranda* waiver and voluntarily waived his rights back in 2000 when he was 18 . . . ." Tr. at 71. The trial court found this previous experience insufficient to ensure Keller had been properly advised and understood his rights before waiving them. *Id.*

On appeal, the State asserts that the trial court's grant of suppression is against the weight of the evidence. The State argues that the totality of the circumstances indicates the State's burden of advisement under *Miranda* was adequately met even without a colloquy between law enforcement officers and Keller. We disagree.

 *Miranda* requires that a person must be warned of the right to remain silent, or to discontinue answering questions at any time, that his answers may be used against him, and that he has the right to the presence of an attorney, either retained or appointed. 384 U.S. at 444, 86 S.Ct. 1602. Several means of sufficiently informing an individual are commonly employed by law enforcement, including a candid two-way discussion between law enforcement and the accused regarding these constitutional rights, an oral recitation or reading of the rights to the accused followed by directly questioning whether the accused understands these rights, provision of an advisement of rights form read aloud by the accused before it is signed, or any combination of these. Due to the various ways a person may be warned under *Miranda*, a claim that advisements were inadequate requires that the State prove the warnings were given with sufficient clarity. *Allen v. State*, 686 N.E.2d 760, 770 (Ind.1997), *cert. denied*, 525 U.S.

1073, 119 S.Ct. 807, 142 L.Ed.2d 667 (1999). For instance, as is presently the case, "a signed waiver form is one item of evidence showing that the accused was aware of and understood his rights." *Id.* Even so, the State may be required to produce further evidence tending to show that a defendant understood and voluntarily waived his rights. *Id.*

The trial court indicated at the suppression hearing that it wanted to see some type of verbal exchange between the law enforcement officers and Keller. To counter this sentiment, the State argues that Sergeant Gullion and Detective Scheid were under no obligation to provide an oral warning or to read the advisement of rights form to Keller. The State points to *United States v. Van Dusen*, 431 F.2d 1278 (1st Cir.1970), where agents of the Federal Bureau of Investigation provided an individual with an advice of rights form and waiver before commencing with an interrogation. The agents did not read the form to the individual, "but testified that a period of some minutes passed during which they observed appellant's eyes move across the page." *Id.* at 1280. When done, Van Dusen indicated that he understood his rights, refused to sign the waiver, but voluntarily began providing the agents with information that implicated him in a forged checks scheme for which he was ultimately convicted.

On appeal, Van Dusen argued that the agents should have provided the *Miranda* warning orally. The appellate court disagreed, holding as a matter of law that such a course of action is not mandatory. *Id.* It found that there was no indication that Van Dusen could not or did not read the form in the amount of time provided to him because he appeared to read it and indicated his understanding of its contents, all leading to the conclusion that the Government had met its burden. *Id.* at 1281.

On this point, the appellate court specifically reasoned that requiring "the agents to read the form aloud in every such situation would seem both to discourage use of a printed form and to mechanize a ritual without necessarily communicating more understanding." *Id.* at 1280.

Clear communication of an individual's rights and understanding was central to our supreme court's decision in *Dickerson v. State,* 276 N.E.2d 845, 257 Ind. 562, (Ind.1972). In that case, a law enforcement officer presented the accused with an advice of rights form, telling him to read and sign it if he understood. The officer did not inquire if the individual was literate, orally inform him of his rights, or make any attempt to ascertain if he understood the form. The supreme court held that this method of warning was inadequate to comply with the requirements of *Miranda. Id.* at 850. Although not mandating a particular procedure to be followed prior to every interrogation, the supreme court called for clear explanation of rights and a determination of understanding. To obtain a signature indicating a knowing and intelligent waiver, the supreme court explained that the

> [a]ppellant should not have been instructed to sign the form if he understood it, but rather should have been informed that he would be signing a waiver of his rights and that he should sign it only if he desired to answer questions at that time without the presence or advice of an attorney.

*Id.* Moreover the supreme court stated that "[t]o hold otherwise would be to place the entire burden of understanding his constitutional rights on the accused, and additionally, to rely solely on the accused to clarify the contradictory instructions given by the police officer." *Id.*

The case at hand is similar to both *Van Dusen* and *Dickerson.* Keller was not orally advised of his rights, but was provided with a form and told to sign if he understood it. After Keller briefly reviewed the form he both initialed and signed it. However, unlike in *Dickerson,* a law enforcement officer ascertained that Keller was able to read and write prior to giving Keller the form, and Keller subsequently affirmed that he had read the form. On the other hand, Keller did not affirm that he understood the document as the accused did in *Van Dusen.* In light of the totality of the circumstances, we cannot say that the advisement provided to Keller was sufficient to ensure a knowledgeable and intelligent waiver of his constitutional rights.

It is true that law enforcement officers are not under a burden to orally advise an individual of his rights in order to comply with *Miranda.* However, we emphasize that an oral advisement, whether or not accompanied by the use of a form, is the preferred method of ensuring an accused's constitutional rights. A colloquy between law enforcement officers and those accused of crimes does more than merely "mechanize a ritual" as suggested in *Van Dusen.* 431 F.2d at 1280. Rather, it avoids the loss in reality of rights declared by the words of the Constitution, and enforces them against overzealous police practices. *Miranda,* 384 U.S. at 443–44, 86 S.Ct. 1602. Indeed, had a colloquy between Sergeant Gullion or Detective Scheid and Keller existed in the present case, the adequacy of the warning provided to him would likely not be at issue.

The State also contends, citing *Light v. State,* 547 N.E.2d 1073, 1079 (Ind.1989) (citing *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979)), that Keller's understanding and subsequent valid waiver of his constitutional rights can be inferred from his initialing and signing the advice of rights form, as

well as by statements he made during the course of the three-hour interrogation. Yet, as noted in *Dickerson*, by itself, the practice of requiring an individual to sign an advice of rights form only if he understands its content places the entire burden of understanding his rights upon the accused. 276 N.E.2d at 850. This burden must be borne in significant part by the State, who ultimately must show a knowing, intelligent, and voluntary waiver of those rights. Here, the State argues that Keller's affirmation of having read the form, and his failure to indicate he lacked understanding, signifies he indeed understood its content. This argument is unpersuasive. Scenarios such as where an accused is hiding illiteracy, or is simply embarrassed by a lack of comprehension, underscore the necessity of the State's taking a proactive role in insuring an individual's understanding prior to waiver during an interrogation. Here, although Keller was asked if he could read and write, no determination was made as to the level at which he could do so, and Keller's response, if any, to Sergeant Gullion's inquiry as to whether he understood the form is unclear. Thus, we conclude that in the present instance these are not enough to infer a knowing and intelligent waiver by Keller.

We agree with the trial court that Keller's single prior experience of voluntarily waiving his rights is alone not enough to guarantee his advisement and understanding of those rights in the present context. We also note that the record does not establish the law enforcement officers were aware of or relied upon Keller's past experience with the waiver of his constitutional rights. Furthermore, although Keller made remarks indicating that he understood his statements were self-incriminating,[4] there was no indication that he understood his right to have an attorney present or to stop answering questions at any time. To the contrary, at one point during the questioning, while discussing the protection of Keller's mother, Keller is directly asked, "Who do you think is gonna pay for your lawyer?" Tr. at 23. Keller's partially inaudible response is that he and/or his mother cannot afford a lawyer. The officer responds "I bet she helps with it," rather than clarifying the contradiction or ascertaining whether Keller understands his constitutional right to the appointment of an attorney. *Id.*

In light of the totality of the circumstances surrounding Keller's interrogation, we cannot say the State has met its burden of establishing that Keller's waiver was based on his knowledge and understanding of his constitutional rights. Thus, we affirm the trial court's ruling, and reiterate our supreme court's exhortation in *Dickerson* that law enforcement officers clearly explain a person's constitutional rights and determine the accused's understanding prior to commencing an interrogation. The burden imposed on law enforcement in doing so is minimal when compared with the substantial individual rights involved.[5] Here, for instance, the

---

**4.** During an exchange where he inquired whether his responses were "on the record," Keller stated: "But that paper right there . . . meaning that anything I say can be brought up against me right? . . . So we can't tear that piece of paper up right there and then I ask you a question about something?" State's Ex. 2 at 5. Keller's reference to the form reveals he comprehended one of the

rights it enumerated, but it does not necessarily follow that his understanding came from reading the advice of rights form.

**5.** A similar burden is imposed when other constitutional rights are involved, such as the automatic right to a jury trial. As with the rights enumerated in *Miranda*, a defendant is presumed not to waive this right unless affir-

officers need only have spent a few minutes at the beginning of a three-hour long interrogation.

### B. Voluntary Waiver

 The trial court granted Keller's motion to suppress his first statement partly due to its finding that the evidence did not indicate Keller freely and voluntarily waived his rights. Because we hold that Keller's waiver was invalid because of the State's failure to establish he knew and understood his rights, we need not reach the question of whether the waiver was voluntarily given. However, we do so now in order to completely address the larger issue of the waiver under *Miranda*.

 A statement is voluntary if, in the light of the totality of the circumstances, "the confession is the product of a rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *Wessling*, 798 N.E.2d at 936. Therefore the critical inquiry is whether Keller's statement was induced by violence, threats, promises, or other improper influence. *Id.* Our supreme court has provided an open list of factors that may be considered when reviewing the totality of the circumstances for whether a waiver of rights was voluntary, which includes police coercion, the length of the interrogation, its location, its continuity, as well as the defendant's maturity, education, physical condition, and mental health. *Miller*, 770 N.E.2d at 767.

The trial court made no findings of fact to support the conclusion that Keller's statement was given involuntarily. Indeed, the record lacks any indication that Keller was mistreated during the interrogation or that he was unable to provide a statement of his own volition due to disability, mental state, or physical condition. Keller made no such arguments during the hearing. However, on appeal Keller asserts that his statement was the product of being treated with unnecessary rigor during the interrogation.

Under Article 1, section 15, of the Indiana Constitution, "No person arrested, or confined in jail, shall be treated with unnecessary rigor." In particular, Keller argues that he was exposed to rigorous treatment when law enforcement officers asked him to remove his clothing, including his underwear, and to change into an orange prisoner outfit in their presence and while the video camera was recording. Although acknowledging that the officers had a warrant to collect his clothes, Keller contends that the manner in which they were taken from him was meant to "threaten and humiliate" him, and to "weaken [Keller's] desire to not speak . . . ." Br. of Appellee/Defendant at 6, 7.

Preliminarily, we note that Keller was unaware of the video camera, which therefore could not have influenced how he felt about removing his clothing. Moreover, Keller was informed early in the interrogation that he was under arrest, and the officers repeatedly referenced collection of his clothing subsequent to a warrant. As a result, Keller was aware before he changed out of his clothing that it would be taken as evidence and that he would be transferred to jail. Clearly the nature of collecting Keller's clothing and having him change into prisoner's clothes were a mat-

---

mative action to do so is taken, whether by colloquy in court or signed waiver. *Anderson v. State*, 833 N.E.2d 119, 122 (Ind.Ct.App. 2005). In either case, to affect a valid waiver of the right to a jury trial, the defendant's waiver must be knowingly, voluntarily, and intelligently made with sufficient awareness of the relevant circumstances surrounding its entry and consequences. *Id.*

ter of procedure under the circumstances rather than a method of intimidation.

Regardless, our supreme court has limited the reach of Article 1, section 15. In *Moore v. State*, 771 N.E.2d 46, 55 (Ind. 2002), *cert. denied*, 538 U.S. 1014, 123 S.Ct. 1931, 155 L.Ed.2d 851 (2003), a death row inmate challenged his sentence as being unnecessarily rigorous treatment due to the delay in imposing his punishment, during which time he suffered alleged emotional abuse. The Indiana Supreme Court refused to extend application of the section "beyond physical abuse to emotional stress." *Id.* Here, Keller solely alleges emotional abuse through humiliation. Even if such humiliation occurred, Keller's argument fails because it does not reach the level of violating the safeguards imposed by the Indiana Constitution.

Aside from any potential humiliation, it is clear from the record that Sergeant Gullion and Detective Scheid referred to the warrant for Keller's clothes, and to changing into the orange outfit, as part of their interrogation technique, signaling to Keller that the interview would be over and his opportunity to reap any potential benefit from making a statement would be lost. Such a tactic may have asserted pressure on Keller, but it hardly amounted to the degree of coercion necessary to render Keller's statement involuntary. For this reason, based on the totality of the circumstances, we cannot agree with the trial court that Keller's statement was not freely made. However, because the State has failed to establish that Keller's waiver was knowing and intelligent, we affirm the trial court's suppression of Keller's first statement.

### III. Keller's Cross–Appeals

By way of his brief, Keller cross-appeals as to whether the trial court properly denied his motion to suppress on the issues of his second statement to law enforcement and the searches of his hotel room, including his coat. We discuss each in turn.

### A. Keller's Second Statement

■ Keller argues that his second statement to law enforcement should also be suppressed because "the damage to Keller's constitutional rights [was] done and irreparable" by the time he was interviewed a day later. Br. of App./Def. at 9. The trial court refused to suppress the second statement in part because testimony indicated a valid waiver was made beforehand. Keller's argument on appeal is that even with this waiver the statement should be suppressed because the two interrogations should be considered a unified whole rather than separate occurrences.

We recently considered this argument in *Johnson v. State*, 829 N.E.2d 44, 51 (Ind. Ct.App.2005), *trans. denied*, where we considered whether a second statement made to police following a complete *Miranda* warning and waiver should be suppressed as indistinct from a first statement made following a flawed *Miranda* procedure. The analysis of the totality of the circumstances required us to consider whether the case involved a " 'police strategy adapted to undermine the *Miranda* warnings,' " or "a 'good-faith *Miranda* mistake . . . open to correction by careful warnings . . . and posing no threat to warn-first practice generally.' " *Id.* (quoting *Missouri v. Seibert*, 542 U.S. 600, 615, 124 S.Ct. 2601, 159 L.Ed.2d 643, (2004)). Based on the testimony of the detective who administered the warnings, we concluded that the "failure to obtain a valid waiver with regard to the first statement involved a good-faith *Miranda* mistake open to correction by careful warnings, and therefore, did not render the second statement inadmissible." *Id.* Likewise, in Keller's case, law enforcement officers provided Keller with an advice of rights form prior to starting the interrogation, which

shows intent to comply with the requirements of *Miranda.* The failure to ensure the adequacy of the good-faith attempt does not render it closed to correction by subsequent compliance through full advisement of constitutional rights prior to Keller's second statement.

In addition, the circumstances surrounding Keller's questioning do not indicate that it would be unrealistic for us to consider each portion of the two-part interrogation as independent, and therefore subject to independent evaluation. *Compare Drummond v. State,* 831 N.E.2d 781, 784 (Ind.Ct.App.2005) (holding that it would be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuated them in the middle). The day after giving his first statement, Keller was brought back for more questioning by Lieutenant Michael Perkins, who had assisted Sergeant Gullion and Detective Scheid during the first interrogation. Lieutenant Perkins testified that his objective was to gain information regarding the location of another individual Keller had implicated in Cook's death. A knowledgeable, intelligent, and voluntary waiver of constitutional rights was obtained from Keller after Lieutenant Perkins read the advice of rights form in its entirety, and Keller signed the form and affirmed that he understood his rights. This bears little if any relation to the situation in *Seibert* where police officers purposefully withheld *Miranda* warnings until a confession was obtained, thereafter providing *Miranda* warnings and obtaining a waiver before securing a second similar confession. 542 U.S. at 613, 124 S.Ct. 2601. Thus, Keller's second advisement of rights, given prior to an independent interrogation, was sufficient to correct the good-faith mistake made the day before, prior to his first

statement. For these reasons, we affirm the trial court's refusal to suppress Keller's second statement.

### B. Warrantless Search of the Hotel Room

Keller contends that evidence seized from his coat should be suppressed because the search of his hotel room, including the coat, was a violation of his rights under the Fourth Amendment to the United States Constitution, and Article 1, section 11, of the Indiana Constitution. He argues that the trial court erred by not granting his motion to suppress this evidence.

#### 1. 4th Amendment Protections

The Fourth Amendment ensures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by the government. U.S. Const. amend. IV. We include a hotel room within the definition of "home" for Fourth Amendment purposes. *Tate v. State,* 835 N.E.2d 499, 505 (Ind.Ct.App.2005), *trans. denied.* Searches and seizures conducted without prior judicial approval are per se unreasonable, subject only to a few established exceptions. *Id.* at 506. The pertinent question, then, is whether the search of Keller's hotel room by law enforcement officials was reasonable.

First, we address the method used by law enforcement officers to initially gain entry into the hotel room. In the course of their investigation, upon arriving at the hotel, Detective Scheid and Sergeant Gullion learned that the room in which Cook had spent the prior night was registered to Sugars. They went to the room in search of Sugars, taking with them a member of hotel maintenance. It was the employee who knocked at the door and announced that it was maintenance. Sergeant Gullion

testified that he and the other officer did not identify themselves as police officers.[6] A woman answered the door, and allowed the officers to enter the room. Inside, the officers discovered that Sugars was not present, and conducted an officer-safety search of the occupants' clothing—including Keller's coat—prior to allowing them to dress and escorting them into the hallway. The officers testified this was to ensure none of the occupants had weapons in their clothing. It was during this search that Sergeant Gullion discovered and confiscated a bullet from Keller's coat, and encountered drugs and money, which he left in the coat.

 As we have noted in the past, where officers approach a hotel room during an investigation, their actions are characteristic of "knock and talk" situations. *Id.* at 507. "A knock and talk investigation involves officers knocking on the door of a house, identifying themselves as officers, asking to talk to the occupant about a criminal complaint, and eventually requesting permission to search the house." *Hayes v. State*, 794 N.E.2d 492, 496 (Ind. Ct.App.2003), *trans. denied* (internal quotations and citation omitted). "The prevailing rule is that, absent a clear expression by the owner to the contrary, officers may, in the course of their official business, approach a dwelling and seek permission to question an occupant without probable cause." *Tate*, 835 N.E.2d at 507. We have acknowledged that "[w]hile not per se unlawful, the knock and talk procedure 'pushes the envelope' and can easily be misused." *Hayes*, 794 N.E.2d at 497 (explaining that this investigatory technique "might more aptly be named 'knock and enter'" since the officers' goal is usually to conduct a warrantless search of the premises and not merely to speak with an occupant).

Here, the officers went to the hotel as part of their investigation, but without a warrant. Had they knocked on the room's door and identified themselves as members of the Sheriff's Department prior to asking to be let in, any permission to enter would have obviated the need for probable cause or a warrant. Instead, the occupants were only informed that maintenance was at the door. Gaining entry under such false pretenses exemplifies the concern we expressed in *Hayes* that knock and talk investigations could be easily misused. As a result, without having properly identified themselves before obtaining permission to enter the room, the officer safety search that followed was in violation of the Fourth Amendment, and any evidence seized was fruit of the poisonous tree.

██ But the improper entry by deceptive means and subsequent search was not the only tactic used by the officers. They also sought out Sugars, who was eventually brought to the hotel and signed a form consenting to a search of the room registered in her name. Obtaining valid consent is a well-recognized exception to requirement of a search warrant.[7] *Halsema*

---

6. Although the transcript does not indicate whether the officers were in uniform at the time of the initial entry into the hotel room, the videotape of the subsequent interrogation of Keller shows both Detective Scheid and Sergeant Gullion in plain clothes.

7. The facts here are distinguishable from the situation presented in *Georgia v. Randolph*, —— U.S. ——, 126 S.Ct. 1515, 164 L.Ed.2d 208, 2006 WL 707380 (U.S.2006), a case recently decided by the United States Supreme Court. In that case, police went to the home of Scott and Janet Randolph to investigate a domestic dispute. Janet informed the police that Scott was using drugs, and that drugs would be found inside the couple's home. While standing outside the house with both Janet and Scott present, one of the officers asked Scott for permission to search the house, and Scott refused. The officer then turned to Janet and asked for her permission

*v. State*, 823 N.E.2d 668, 676 (Ind.2005). Such consent may be given by a third party having common authority or a sufficient relationship to the premises to be searched. *Id. See Tate*, 835 N.E.2d at 506 (concluding that officers did not need probable cause to conduct a reasonable search of a motel room where the registered occupant of the room signed a valid consent form). Because Sugar's consent was adequate to permit a search of the room, evidence improperly seized by officers during the previous safety search would have been encountered by different and legitimate means. Therefore, although we disapprove of the officers' method of gaining initial entry, which resulted in an improper search and seizure, we hold that Sugar's valid consent—given shortly thereafter—was sufficient for a proper search of the hotel room. As such, the evidence discovered is admissible, and the trial court's denial of suppression is upheld.

### 2. *Indiana Constitutional Protections*

▇▇▇▇ The language of Article 1, section 11, of the Indiana Constitution tracks that of the Fourth Amendment, but our state has adopted a different form of analysis. *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind.2005). In Indiana, the validity of a search by law enforcement officers turns on an evaluation of the reasonableness of officer conduct under the totality of the circumstances. *Id.* In reviewing all the facts and circumstances of the search, we consider "both the degree of intrusion into the subject's ordinary activities and the basis upon which the officer selected the

subject of the search or seizure." *Tate*, 835 N.E.2d at 507.

Here, during their investigation of Cook's death, the officers arrived at the hotel in which Cook spent his last night alive. The officers learned that Cook's room was registered to Sugars. The search for Sugars brought them to the room itself, where they gained entry without identifying themselves as Sheriff's Department officers. They discovered that Sugars was not present, conducted a brief search for officer safety, and encountered Keller as one of the occupants. Sugars was eventually brought to the hotel and signed a form consenting to a search of the room. In light of the ongoing murder investigation, we determine that the degree of intrusion was minimal once consent was obtained, and that the officers specifically selected the hotel room for further investigation. For these reasons, although the method employed to gain initial entry into the room was unreasonable, we hold that the subsequent consensual search was reasonable under Article 1, section 11, and Keller's argument for suppression of the evidence obtained pursuant to the search fails.

### *Conclusion*

In light of the totality of the circumstances surrounding Keller's interrogation, we cannot say the State has met its burden of establishing that Keller's waiver was based on his knowledge and understanding of his constitutional rights. How-

---

to search the house. Janet consented to the search, and inside the house the police found evidence of cocaine residue in a straw. Scott was charged with possession of cocaine, and moved to suppress the cocaine evidence. The trial court denied the motion, and Scott appealed. The Georgia Court of Appeals reversed, and the Georgia Supreme Court affirmed its decision. The Supreme Court

agreed with the Georgia Supreme Court and held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Id.* at 1526, 2006 WL 707380, at *10.

ever, the good-faith *Miranda* error that occurred prior to Keller's first statement was sufficiently corrected to permit the use of his second statement. Lastly, we do not approve of the misuse of the knock and talk method of investigation to gain initial entry into the hotel room Keller was occupying, but we uphold the trial court's ruling that the officer's subsequent consensual search was reasonable. We therefore affirm the suppression of Keller's first statement to law enforcement, as well as the denial of Keller's motions to suppress his second statement and evidence encountered in the search of the hotel room.

Affirmed.

RILEY, J., and MAY, J., concur.