## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 02 2016, 9:03 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Scott L. Barnhart
Brooke Smith
Keffer Barnhart LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Michael Gene Worden
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Beth Montgomery, | December 2, 2016 |
| *Appellant-Defendant,* | Court of Appeals Case No. 82A01-1603-CR-568 |
| v. | Appeal from the Vanderburgh Superior Court |
| State of Indiana, | The Honorable Robert J. Pigman, Judge |
| *Appellee-Plaintiff* | Trial Court Cause No. 82D03-1410-F1-3805 |

**Baker, Judge.**

[1] Beth Montgomery was convicted of Neglect of a Dependent Resulting in Death,[1] a Level 1 Felony, and Neglect of a Dependent,[2] a Level 6 Felony. She appeals her Level 1 Felony conviction, arguing that her statement to law enforcement officers should not have been admitted as evidence and that there was insufficient evidence to sustain the conviction. Finding no error and sufficient evidence, we affirm.

## Facts

[2] Montgomery suffers from depression, chronic migraine headaches, and chronic back pain. She took anti-depressant and pain medications during and after her pregnancy with B.B. On August 27, 2014, Montgomery was admitted to the hospital and delivered B.B. During and following the delivery, Montgomery suffered from complications that required emergency medical treatment. B.B. also required medical attention because he had respiratory distress and withdrawal symptoms, but he was released from the hospital seven days later in a healthy condition. Upon B.B.'s discharge, Montgomery and John Bivens, Montgomery's fiancé and B.B.'s father, were provided with information about how to care for B.B. This information included instructions that the baby was to sleep on his back in a crib by himself.

---

[1] Ind. Code § 35-46-1-4(b)(3).

[2] I.C. § 35-46-1-4(a).

[3]     On September 29, 2014, Bivens returned home from work and cared for B.B. and his older sibling, K.B., while Montgomery slept for a few hours. Before he and K.B. went to sleep in the master bedroom, Bivens made sure that Montgomery was awake and coherent so that she could care for B.B. At some point that night, Montgomery fell asleep on the couch.

[4]     Around two a.m. on September 30, Montgomery woke Bivens up because B.B. was next to her and not moving. Montgomery called 911, and the 911 dispatcher instructed Bivens to perform CPR on the baby. When the fire department personnel arrived at the home, one of the first responders observed that B.B. was so pale that he matched the color of his diaper and that he was stiff and cold. The first responder took over CPR, and after about ten or fifteen minutes, the baby was transported to the hospital, by which time he was already deceased. The cause of death was suffocation.

[5]     The same first responder decided to call the Sheriff's Department because of the poor condition of Montgomery's trailer home. Among other things, it was dirty, it contained at least ten dogs and cats, it smelled strongly of animal urine, and it was covered with dog droppings.

[6]     Montgomery and Bivens voluntarily went to the Vanderburgh County Command Post for questioning. While there, Montgomery was advised of her *Miranda*[3] rights, which she waived by signing a written waiver form.

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Montgomery initially told the detectives that she woke up in the middle of the night, that B.B. was in his bassinet, that she discovered that he was cold, and that he must have rolled over onto his stomach. When the detectives said that B.B. was too young to roll over, Montgomery insisted that she had seen him roll over twice before and that he had been holding his head up since he came home from the hospital.

[7] At one point, Montgomery asked the detectives whether she needed an attorney, but the interview continued. Eventually, she told them that she wanted an attorney and asked whether she was free to leave. When told that she was not free to leave, she asked whether she was under arrest, and the detectives told her that she was. The detectives left the room. Montgomery then opened the door and asked, "Can I speak with you?" Tr. p. 331. She asked what she was under arrest for, and one detective said that the condition of the house was enough to substantiate a charge of neglect. Shortly thereafter, Montgomery started talking about what happened to B.B., explaining that when she woke up, the baby was lying face down on the couch next to her, that he was not breathing, and that he was cold.

[8] On October 2, 2014, the State charged Montgomery with Level 1 felony neglect of a dependent resulting in death and Level 6 felony neglect of a dependent. On March 6, 2015, the trial court held a hearing on Montgomery's motion to suppress evidence related to her statement to the detectives, and on March 27, 2015, the trial court denied the motion. On December 1-3, 2015, a jury trial took place, and the jury found Montgomery guilty as charged. The trial court

sentenced her to twenty years incarceration for the Level 1 felony and one year incarceration for the Level 6 felony, with the sentences running consecutively.

# Discussion and Decision

## I. Statement to Law Enforcement Officers

Montgomery argues that the trial court erred when it allowed her videotaped interview with law enforcement officers to be admitted into evidence. A trial court has broad leeway regarding the admission of evidence. *Smith v. State*, 889 N.E.2d 836, 839 (Ind. Ct. App. 2008). We will reverse only if the decision is clearly against the logic and effect of the facts before the trial court. *Figures v. State*, 920 N.E.2d 267, 271 (Ind. Ct. App. 2010).

Montgomery first contends that the trial court should not have admitted her statement because the detectives violated her *Miranda* rights when they continued questioning her after she expressed interest in getting an attorney. "To invoke the right to counsel, it is not enough that the defendant *might* be invoking his rights; the request must be unambiguous." *Bailey v. State*, 763 N.E.2d 998, 1103 (Ind. 2002) (quotation marks and citation omitted) (emphasis original). An officer does not need to stop questioning when an accused makes an equivocal statement requesting counsel, nor does the officer have to ask clarifying questions to determine whether the accused wants counsel. *Id.* Further, when an individual who is being interrogated invokes her right to counsel but "initiates 'further communication, exchanges, or conversations' with law enforcement, then the individual may be further interrogated without

counsel present." *Hartman v. State*, 988 N.E.2d 785, 788 (Ind. 2013) (quoting *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)).

[11] The record shows that the detectives advised Montgomery of her *Miranda* rights before questioning her and that Montgomery understood her rights before she signed the waiver form. During questioning, when Montgomery asked whether she needed an attorney, the detectives lawfully continued the conversation. In the first instance, Montgomery asked, "Do I need an attorney cause I feel . . ." and said "I'm feeling like I'm being . . . ." Tr. p. 320. These statements constitute an equivocal request, and the detectives were not obligated to stop questioning her at that point. *See King v. State*, 991 N.E.2d 612, 618 (Ind. Ct. App. 2013) (finding that defendant's question of "Am I going to need an attorney?" did not constitute an unequivocal request for counsel); *Collins v. State*, 873 N.E.2d 149, 156 (Ind. Ct. App. 2007) (finding that defendant's statement, "I probably need an attorney," was an observation rendered equivocal by the use of the word "probably").

[12] In the second instance, Montgomery stated, "I think I need an Attorney is what I think. Yeah I want an Attorney. I'm free to leave right?" Tr. p. 330. The detectives told her that she was not free to leave. Montgomery asked, "So am I under arrest?" *Id.* at 331. At that point, the detectives left the interview room, but Montgomery opened the door and said, "Can I speak with you?" *Id.* She asked why she was under arrest, and one detective told her that the condition of her house warranted a charge of neglect for both of her children. One detective said, "I mean you want to talk to us, if you're wanting to talk to us I'll be glad

to talk to you and let you know what's going on. But if your [sic] gonna come to the door do you want to talk to us?" *Id.* at 331-32. Montgomery said, "Yeah I, I wanted to know what I was . . . ." *Id.* at 332. Detective Chapman said, "Did you not come to the door and say, can I talk to you?" *Id.* Montgomery replied, "Yeah but first I want know what I'm being arrested for or what I'm going to be charged with?" *Id.* The detectives then resumed questioning her.

[13] When Montgomery opened the door and asked whether she could speak with the detectives, she initiated further communication with them, thereby allowing the detectives to continue to question her. Montgomery claims that she did not reinitiate the interrogation but merely asked the detectives an administrative question about why she was being arrested. She points to no authority to justify such a distinction, and we find that her question was properly considered to be a communication that allowed the detectives to resume questioning her. *See Owens v. State*, 732 N.E.2d 161, 164 (Ind. 2000) (finding that the defendant initiated further communication with the detective such that his rights were not violated when, after the detective ceased questioning after the defendant requested a lawyer, the defendant inquired about his mother and asked, "What could happen to somebody that did this?"). Montgomery also claims that the detectives did not scrupulously honor her right to counsel; we note, however, that before the detectives resumed questioning her, they twice confirmed that she wanted to talk with them and that she was the one who initiated the conversation after they stopped it.

[14] Montgomery next contends that the trial court should not have admitted her statement because it was involuntarily given. Specifically, she asserts that "[i]t is questionable whether Beth's statement is a product of rational intellect in light of the timing of the interrogation and the fact that it occurred mere hours after the death of her infant son, and while she was in a fragile emotional and mental state." Appellant's Br. p. 15.

[15] "A statement is voluntary if, in the light of the totality of the circumstances, the confession is the product of a rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *State v. Keller*, 845 N.E.2d 154, 165 (Ind. Ct. App. 2006) (quotation marks and citation omitted). Factors that may be considered when reviewing the totality of the circumstances for whether a waiver of rights was voluntary include police coercion; the length, location, or continuity of the interrogation; and the defendant's maturity, education, physical condition, and mental health. *Id.*

[16] Montgomery does not allege that she suffered physical abuse, psychological intimidation, or deceptive interrogation tactics, nor does the record support the idea that Montgomery was mistreated while at the command post. Although she was emotionally upset by the death of her son, we cannot say that such feelings negate the voluntariness of her statement.

[17] Because Montgomery's rights were not violated when the detectives obtained her statement, we find no error in the trial court's admitting it into evidence.

However, even if we found that the trial court had committed an error in admitting her statement, it would have been harmless because, as discussed below, the conviction is supported by other substantial independent evidence of guilt. *E.g.*, *Headlee v. State*, 678 N.E.2d 823 (Ind. Ct. App. 1997).

## II. Sufficiency of the Evidence

[18]    Montgomery argues that there is insufficient evidence supporting her conviction for neglect of a dependent resulting in death because she did not knowingly fall asleep with B.B. in her arms. When reviewing a claim of insufficient evidence, we will consider only the evidence and reasonable inferences that support the conviction. *Gray v. State*, 957 N.E.2d 171, 174 (Ind. 2011). We will affirm if, based on the evidence and inferences, a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). Circumstantial evidence alone is sufficient if inferences may reasonably be drawn that enable the factfinder to find the defendant guilty beyond a reasonable doubt. *Pratt v. State*, 744 N.E.2d 434, 437 (Ind. 2001).

[19]    To convict Montgomery of Level 1 felony neglect of a dependent resulting in death, the State was required to prove beyond a reasonable doubt that she was "[a] person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally . . . place[d] the dependent in a situation that endanger[ed] the dependent's life or health," that she was at least eighteen years old, and that the care "result[ed] in the death of a dependent who is less than fourteen (14) years of age." Ind. Code § 35-46-1-

4(a)(1), (b)(3). To establish that Montgomery acted "knowingly," the State was required to prove that she was "aware of a high probability" that she was engaging in that conduct. Ind. Code § 35-41-2-2(b).

[20] Montgomery argues that she was unaware of and had no conscious control over her behavior. The record, however, indicates that Montgomery was well aware of her decisions, which included taking medications that affected her ability to adequately care for her children and home. The evidence shows that the hospital staff informed Montgomery on how to care for B.B. and instructed her on how B.B. was to sleep alone on his back in his crib. Montgomery was aware that it was important for B.B. to sleep on his back—when the detectives questioned her, she emphasized that B.B. always slept on his back. Bivens testified that Montgomery was awake and coherent before he went to bed on the night that B.B. died. The evidence shows that Montgomery knew that she had taken medication that day and was tired that night. The forensic medical evidence established that B.B. died from suffocation as a result of being on his stomach and on a surface that was not flat. Finally, in her statement to the detectives, Montgomery admitted that when she woke up, B.B. was lying face-down on a couch cushion next to her.

[21] Although Montgomery argues that she was unaware of what she was doing, the jury was free to disbelieve her and infer from the surrounding circumstances that she took B.B. out of his bassinet and held him while she was sitting on the couch, thereby placing her baby in a situation in which he could fall asleep in a physically dangerous position. We will not second-guess the jury in its

assessment of her credibility.  The evidence is sufficient to support her conviction for neglect of a dependent resulting in death.

[22]    The judgment of the trial court is affirmed.


Vaidik, C.J., and Najam, J., concur.